KING, APPELLANT, v. AMY AND SILVERSMITH CONSOLIDATED MINING COMPANY, RESPONDENT.

MINES AND MINERAL LAND—*Statutory construction—Extent of location defined where vein crosses a side line.*—Section 2322, Revised Statutes of the United States, provides in substance that the locators of all mining locations shall have the exclusive right of possession and enjoyment of all veins, lodes, and ledges throughout their entire depth, the apex of which lies within the vertical planes of the lines of the surface location, although such veins in their inclination on their course downward cross the vertical plane of a side line; *provided*, that such exterior parts lie within the projected planes of the end lines. *Held*, that where a vein crosses the side line of a location the strike is terminated by the plane of such side line, and the right to follow the vein on its dip is determined by a vertical plane, parallel to the end lines, drawn downward, and which takes effect at the point where the apex intersects the side line.

*Appeal from Second Judicial District, Silver Bow County.*

The cause was tried before DE WOLFE, J., without a jury.

Statement of the facts, prepared by the judge who delivered the opinion.

The plaintiff is the owner of the undivided three fourths of the Non-Consolidated Mining Claim. The defendant is the owner of the other undivided fourth. The defendant is the owner of the Amy Claim. The northerly side line of the Amy is the southerly side line of the Non-Consolidated. The west end line of the Amy is 491 feet long, and runs south, 30 deg. west. The east end line is the same length and course. The north side line is 1,470 feet in length, and runs south, 66 deg. 30 min. west. The south side line is the same length and course. The vein of the Amy Claim, on its onward course or strike, passes through the north side line, and the apex thereof crosses said side line at a point 184 feet easterly from the west end line, and passes into the Non-Consolidated ground. Said vein runs on northwesterly, and does not again enter the Amy ground. The apex of the Amy vein passes out of the south side line of the location, at a point between the southeast corner of the Amy and a point 600 feet westerly therefrom. The dip of the vein is to the north. Four hundred and eleven feet of the north line of the Amy, commencing at a point 17 feet east of the northwest corner, forms the south line of the Non-Consolidated. The west end line of the Non-Consolidated is 181 feet in length,

and runs south, 1 deg. 40 min. west. The east end line is 10 feet long, and the same course. The north side line is 372 feet long, and runs north, 88 deg. 55 min. west. Each claim was located and patented subsequent to the passage of the United States Mineral Land Act of May 10, 1872, and the amendments thereto, and is subject to the provisions of those laws.

The plat on page 423 (Fig. 1) indicates the surface lines of the two claims, and the direction of the strike of the vein.

The plaintiff's action is for partition and accounting against the defendant, alleging that defendant has taken large quantities of ore from subterranean workings at a point north of the Amy north side line, which is the Non-Consolidated south side line. The only controversy is as to where the vertical end line bounding plane should be drawn downward as a limit of the mining operations of the defendant. Plaintiff contends that the Amy north side line should be considered the end line of that claim for all purposes, and that through that side line the vertical plane should be drawn downward perpendicularly, beyond which, to the north, the Amy company cannot follow the vein on its strike or dip. The defendant's position is that the vertical bounding plane, limiting its rights, must be drawn downward at the point where the Amy apex crosses the north side line of the claim; such plane to be parallel to the planes of the end lines as located by the Amy. On the trial the court took a view at variance with those of both plaintiff and defendant, and held that the bounding plane must be placed at the point where the apex crosses the north side line of the Amy; but that such plane must be drawn downward at a right angle to the strike of the vein at that point. The plat (Fig. 1) indicates the positions of the three planes described. They intersect at a common point (e, on the plat), viz., the point of departure of the apex from the Amy exterior boundaries. Judgment was entered in accordance with the views of the District Court. The plaintiff appeals. The case comes before this court as a triangular contest. Since the decision below, the learned judge who tried the case appears as counsel for the respondent, and urges the theory for the respondent, which the court below adopted. Co-counsel for respondent presents the theory which he held below. Appellant's position is as it was in the District

Court. For convenience in terms we will designate these theories as follows: (1) The doctrine adopted by the court below will be called the court's theory and line and plane; (2) that contended for by the appellant, the plaintiff below, the appellant's; (3) that urged by the respondent, the defendant below, and presented by one of its counsel here, as the respondent's. The point where the ore was taken out by the defendant is north of the appellant's plane, and east of each of the two other planes. Whether the court's or respondent's view is adopted is practically immaterial to the respondent, but the principles involved are vitally at variance. A decision as to which theory of the plane is the law in the case is the whole and only controversy. That decision will settle the title to the portion of the vein from which the ore was taken.

*E. W. Toole,* and *William Scallon,* for Appellant.

The court expressly found that the vein in question runs out of *both the side lines* of the Amy Claim. The Amy location was therefore made crosswise of the vein so that its so-called side lines instead of its nominal end lines cross the vein at the surface. In such a case it is settled by the decisions of the Supreme Court of the United States that the so-called side lines are the real end lines of the claim, and that the respondent cannot go beyond them, even if the apex of the vein be inside of the Amy lines.

In *Mining Co. v. Tarbet,* 98 U. S. 463 (*The Flagstaff Case*), it is decided in so many words that the end lines of a claim properly so called "are those which are crosswise of the general course of the vein on the surface." And the court say (pp. 467, 468): "We think that the intent of both statutes [1866 and 1872] is that mining locations on lodes or veins shall be made thereon lengthwise, in the general direction of such veins or lodes on the surface of the earth where they are discoverable; and that the end lines are to cross the lode and extend perpendicularly downwards, and to be continued in their own direction either way horizontally; *and that the right to follow the dip outside of the side lines is based on the hypothesis that the direction of these lines corresponds substantially with the course of the lode or vein at its apex at or near the surface.* . . . . . If he has located

crosswise of the lode and his claim is only 100 feet wide, that 100 feet is all he has a right to." [The italics are ours.] The Amy is only 491 feet wide, but the judgment seeks to give it 800 feet along the vein in opposition to the ruling just cited. This decision has been affirmed in *Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 196, and in *Argentine Min. Co.* v. *Terrible Min. Co.* 122 U. S. 478. In the *Iron Silver* v. *Elgin Case* it is also settled that the lines *as surveyed* must govern, and that no judicial adjustment of lines can be allowed. It will be noticed that the court in the case at bar really adopts the minority view set forth in the *dissenting* opinion of the late Chief Justice Waite in the *Iron Silver* v. *Elgin Case.* The Chief Justice says that in his opinion "the end lines of a mining location are to be projected parallel to each other and crosswise of the general course of the vein within the limits of the location. . . . . The end lines are not necessarily those marked on the map as such, but they may be projected at the extreme points where the apex leaves the location as marked on the surface." The majority of the court held, on the contrary, that "the boundary planes should be definitely determined by the lines of the surface location," and that "if the first locator will not or cannot make the explorations necessary to ascertain the true course of the vein, and draws his end lines ignorantly, he must bear the consequences."

The *Argentine Case* is very closely analogous to the present one. The plaintiff in error in that case, defendant below, was in a position exactly similar to that of the respondent here. It will be seen by reference to the brief of the plaintiff in error, page 482 of the report, that there it set up the very same claim as the respondent does now. Says the plaintiff in his brief: "The premises in controversy were outside of the side lines, and within vertical planes drawn through the end lines of the Pine and Camp Bird lodes, and *just within* the *side line* of the *Adelaide.* [The Adelaide was the claim owned by plaintiff below corresponding to the Non-Consolidated.] Now it was in reference to these workings and these premises at this point that the court was asked to charge *that if they found the apex of this vein within the surface lines of the Argentine Claim* (which included the Pine and Camp Bird claims) *their verdict* should be for the *defendant.* The court not only refused so to charge, but it utterly

ignored all claim of the defendant on this ground. . . . . This was error." [Italics ours.] This was the only error alleged. Here was a case where the owner of the apex was attempting to follow the vein on its dip beneath the points of the apex so owned, although the vein ran out of the side line. Precisely the case at bar. The court, in deciding the case, quote from *Mining Co.* v. *Tarbett* (*The Flagstaff Case*), the statement, among others, that the end lines of the claim properly so called are "those which are crosswise of the general course of the vein on the surface," and say (p. 486): "Such being the law, the lines which separate the location of the plaintiff below from the locations of the defendant are end lines, across which, as they are extended downward vertically, the defendant cannot follow a vein, *even if its apex or outcropping is within its surface boundaries,* and, as a consequence, could not touch the premises in dispute, which are conceded to be outside of those lines and outside of vertical planes drawn downward through them." [Italics ours.] In accordance with the rules thus laid down by the Supreme Court, we claim that "the line which separates the location of the plaintiff below from the location of the defendant is an end line," and that, although the apex of the Amy vein may be within the surface lines of the Amy Claim, the defendant cannot go beyond the vertical plane of said common boundary line.

We therefore respectfully submit that the decree should be modified so as to declare that all those portions of the vein in controversy which lie within the vertical plane of the southern boundary line of the Non-Consolidated Claim and its other boundaries are a part of the Non-Consolidated, and that this claim should be advertised and sold as including such portions.

*W. W. Dixon,* and *Knowles & Forbis,* of counsel, for Respondent.

As stated in appellant's brief, the only question for decision in this case is the construction of the mining law, with reference to the rights of adjoining claimants, in cases where the vein or lode in its strike or course crosses the side instead of the end line of the claim. The plaintiff contends that in such case the side line becomes an end line absolutely for all purposes beyond

which the claimant cannot go on the dip of his ledge, although in its downward course the ledge may so far depart from a perpendicular as to enter the ground of the adjoining claimant. The position of the defendant and respondent is that the side line in such cases becomes an end line for the purpose of cutting off the vein or lode in its strike or onward course, but not in its dip or incline. That if the ledge dips in its downward course from the ground in which its apex is situated, the owner of the claim in which the apex is found may follow the dip of the ledge to any depth whatever, and although by so doing he may enter upon the ground of another. This right to follow, the respondent maintains, is confined to the length of the vein as shown by the apex within the ground of the claimant, and in following such dip the owner must confine himself within a line drawn parallel to the end lines of the claim, at the point of the intersection of the side line with the apex of the vein. Upon the trial of the case, the court took a view of the law at variance with the positions of both the plaintiff and defendant. While holding that the owner of the apex might follow the dip of the vein beyond his or its side line, and into the ground of the plaintiff, the court held that such dip or incline must be followed within a line drawn at right angles to the strike of the vein at the point of its crossing the side line. The position taken by the court, and the position assumed by the defendant, in so far as this case is concerned, in their practical effects are the same. This arises from the fact that the end lines of the Amy Claim are almost parallel to a line drawn at right angles with the strike of the vein in controversy, and as a consequence the effect of the decision as it now stands leaves but little difference between the line as insisted upon by the defendant and as defined by the court. However, the defendant believes there is a great difference in principle between its position and the decision of the court.

The only decisions bearing upon the question, so far as we have been able to ascertain, are those cited by the appellant in his brief, all of them being the decisions of the Supreme Court of the United States. The first of these decisions in order is the case of *Flagstaff S. Min. Co.* v. *Tarbet*, 98 U. S. 463. In this case it was attempted to invoke the doctrine that had prevailed before the enactment of a mining law by Congress.

Theretofore it had been held that one having a location upon a claim could follow the strike of the vein in whatever direction it might run.   The location was the vein and nothing else, and if the locator was mistaken in its course, he might, nevertheless, follow the vein for the full number of feet which he was entitled to, and did locate.   Under a location made under the law of 1866 it was contended that this still might be done, and if the vein in its onward course departed through the side lines, the locator of the claim might follow it on its course to the full extent of the vein which he had located, or attempted to locate. This the Supreme Court says he may not do ; that the ground located fixes the extent of his right to the vein ; whatever extent of vein might be included therein, that he had a right to, but he could not go beyond his side lines in following the vein on its strike.   To the extent that this decision goes in the determination of the question in controversy, it corresponds exactly to the position taken and maintained by the respondent.

The next case cited by the appellant is the case of *Iron Silver Min. Co.* v. *Elgin Min. & S. Co.* 118 U. S. 196.   This is the case popularily known as the *Horse Shoe Case.*   We think the decision in this case turned altogether upon the form of the claim, and that the question arising in this case was not considered and did not arise in that.   The court held that on account of the peculiar form of the claim, no end lines had ever been established, and that if the so-called end lines were extended in their own course they would not include the ground in controversy in that action.   In the course of the opinion the court says: "We are, therefore, of opinion that the objection that, by reason of the surface form of the Stone Claim, the defendant could not follow the lode existing therein in its downward course beyond the lines of the claim, was well taken to the offered proof.   Besides, if the lines marked as end lines on the plat of that claim can be regarded as such lines of the location, no part of the Gilt Edge Claim falls within vertical planes drawn down through those lines continued in their own direction."   The decision is not as clear as might be desired upon the point of controversy in this case, but we think the lack of clearness arises from the fact that the particular point therein raised was not discussed, and that the case was decided, not upon the question here in issue, but

upon the fact of the peculiar form of the Stone Claim. That the rule laid down in the *Flagstaff Case,* 98 U. S. 463, was not considered as applying to the *Horse Shoe Case,* is shown by the fact that Justice Bradley, who delivered the opinion in the *Flagstaff Case,* concurred with Chief Justice Waite in his dissenting opinion in the *Horse Shoe Case.*

The other case cited by the appellant is *Argentine Min. Co.* v. *Terrible Min. Co.* 122 U. S. 478. For a better understanding of the facts of the case, and to show really what was in controversy, we call the attention of the court to the decision of Justice Hallett, in the lower court, and from which the writ of error was sued out. This is reported as *Van Zandt* v. *Argentine Min. Co.* 8 Fed. Rep. 725. It appears from the reading of the two decisions that the apex of the lode in controversy ran practically at right angles with the side lines of the Camp Bird and Pine locations, under which the defendants claimed. Under these circumstances if the end lines of the claims, which were nearly parallel with the course of the vein, had been projected at the points of intersection, as we insist must be done in such cases, there would have been but little if any ground lying between them in which the dip of the vein could have been followed. But the defendants in that case insisted that they might follow the vein in its dip or downward course, not *between* these lines, but *across* them. The decision of the court seems to be that the side lines became end lines for the purpose of cutting off the strike of the vein, and that the defendant could not follow across those lines, for the reason that the ground in controversy was not between the end lines extended in their own direction, and projected at the points of intersection of the side lines with the course of the vein. The further facts of the case, as appears from the reports, are that the Adelaide location, under which the plaintiff claimed, was the older location of the two or three claims; that it was made upon the dip of the lode, upon which the location of the Camp Bird and Pine claims were located; that the ground in controversy was within the limits of the Adelaide location, and that the same belonged to the Adelaide location by reason of its prior location, and that the defendants were attempting to take ores from the vein of the Adelaide location across its side line. An examination of the case as

reported in the lower court will show that the question decided
by the United States Supreme Court on appeal was really not
raised or considered below, and the brief of counsel in the
United States Supreme Court shows the same thing. The main
question below was whether a location on the apex of the vein
was superior to a prior location in the dip. In this case, as in
all others decided by the Supreme Court, the question has turned
upon the particular facts of the case, and nowhere has the ques-
tion arisen in a case similar to the one now before the court,
and we contend that none of the cases cited apply to the facts
of a case like that of the case at bar. Aside from all decisions
the reason and purpose of the law seems clear, at least to us.
The intention being to give to every locator all the veins, the
tops or apices of which are within his location. He may follow
such veins in their strike, so long as he does not depart from
his surface ground, but no further, whether the strike be deter-
mined by the side or end, or other line of the claim. He may
follow all such veins in their dip or downward course wherever
they may extend, with the one condition that they must not
depart from within planes drawn downward through his end
lines, or if the vein passes through the side lines, then between
planes drawn downward at the point of departure, parallel to
the end lines. The requirements of the law that these end lines
should be made parallel show what its purpose was. Unless it
was the intention to establish a plane along which the dip of the
lode must be followed, there was no necessity for making the end
lines parallel. By following parallel end lines there can be no
divergence or contraction of the lines within which the dip is to
be followed. Nor in our opinion are these end lines to be fixed
and immovable, but they may be projected to suit any vein that
may be found within the limits of the claim. If the vein departs
through the end line, then the end line becomes the plane upon
which its dip must be followed. If the vein departs from the
side line, then the end line is to be projected at that point of
departure, and followed upon and along the same plane as if it
had departed from the end line. The establishment of the end
line is the establishment of a plane, and its parallelism has no other
purpose than to establish a plane or system of planes, along which
the dip of all lodes within the claim must be followed.

The fact that all of the decisions cited quote so freely from *Mining Co.* v. *Tarbet*, and the effect of that decision is indisputable, shows what was in the minds of the judges in the decision of the other cases, and that is simply this, that the side line becomes the end line for the purpose of cutting off the strike, and for no other purpose, and that the right to follow the dip must always be determined by the parallel end lines.   The rule contended for by appellant would in practice operate very hardly. It is difficult to fix accurately the course of a vein at the time of . location.   And yet, on appellant's theory, the slightest divergence at one or both side lines would cut off the locator's right to follow the vein on the dip at any point beyond his vertical side lines, and there he might lose the most valuable part of his location.   This seems directly contrary to the act of Congress, which gives the locator all veins, the top or apex of which is included within the lines of his location, and the right to follow such veins on their dip within defined planes.   The idea of this act seems to be that the locator has a right to follow the dip to the extent that he has the apex within his lines.   But on appellant's theory the locator might have 1,499 feet in length on the apex of a vein, but no right to dip beyond his vertical side lines. The rule claimed by respondent here seems to conform to all the requirements of the act of Congress, and to secure the locator in all the rights that act gives him.

*S. De Wolfe,* of counsel, for Respondent.

The sole question presented on this appeal is the one stated in the appellant's brief, as to whether the owner of a quartz lode claim has the right to follow a vein or lode on its dip or downward course when the vein on its strike or course crosses the side line of the surface location.   And this involves the true meaning and construction of section 2322 of the Revised Statutes of the United States.   In the trial court, as here, the appellant maintained that the true construction of this section, as well as the adjudications thereon, confined the right to follow a vein or lode on its dip or downward course, and was limited to such veins or lodes as in their strike or course departed through the end lines of the location, and did not apply to veins which crossed

the surface side lines; that, as to such veins, the side lines of
the location became the end lines of the vein, beyond which the
owner or locator had no right to follow the vein on its dip or
downward course. The respondent, on the other hand, con-
tended that the right of the owner to follow a vein on its dip or
downward course was the same whether it crossed the end lines
or side lines of the surface location, but maintained that the
right must be confined to such portion of the vein or lode as
lie between lines drawn parallel to the end lines on the surface
and crossing the vein where it departs through the surface side
lines. The judge before whom the trial was had took a differ-
ent view of the law from either of these, and held that lines
drawn at right angles through the vein or lode where it crossed
the side lines, and these lines extended in the direction of the dip
of the vein until it intersected a vertical plane drawn downward
through the end lines of the location, and continued in the same
direction to the place of intersection, constituted the true dip
of the vein, and the part which the locator was entitled to fol-
low in its downward course.

The object of the present brief is to sustain the construction
of the law given by the court. Practically it may not be of
importance in the present case whether the court sustains this
view, or the theory maintained by my co-counsel for respondent.
But the question is an interesting one, and may be of vital
importance in other cases. The question for decision is this:
What is meant by the dip or downward course of a vein as used
in the section of the mining law cited? The law entitles the
locator to all veins, the top or apex of which lies within the sur-
face lines of the location extended downward vertically, with
the right to follow such veins on their dip or downward course,
although they may so far depart from the perpendicular as to
extend outside the vertical side lines of the surface location.
Nothing whatever is said in the law about projecting end lines
parallel to the end lines of the surface location, and crossing the
vein at the point at which it departs through the surface side line.
Such lines are arbitrary in themselves and involve a legal as well
as mathematical absurdity. In theory, the dip or downward
course of a vein must of necessity be at right angles with its strike
or course at the surface. This may not be always true, for experi-

ence has shown that veins change in their dip, but whatever the dip the locator or owner has the right to follow it in its downward course, and the right to the vein on the dip corresponds in length to the apex of the vein where it comes to, or nearest the surface. If the theory claimed by the leading counsel for respondent of projecting lines drawn parallel to the end lines of the location be correct, the right of the locator would vary with the varying angles at which the vein crossed the surface location. If it was at right angles, the side lines of the location would then be the end lines on the lode, as was held in the case of *Flagstaff Min. Co.* v. *Tarbet*, 98 U. S. 463. Under this theory of projecting lines through the vein parallel to the end lines of the location, it follows as a mathematical fact that whenever the distance between lines so drawn is less than the length of the lode on its strike or course, the locator or owner gets less of his lode on its dip or downward course than he has on the surface or strike, and further, that his right on the dip of the vein will vary with every angle at which his vein crosses the surface location. Whereas, by drawing lines at right angles with the strike of the vein at the points through which it departs from the surface side lines, the owner acquires a section of the vein on its dip or downward course exactly corresponding with the length of the vein on the surface. This right to follow the dip of the vein is limited by the law to vertical planes drawn downward through the end lines of the location, and so continued in their own direction until they intersect such exterior parts of such veins or ledges.

Counsel for the appellant in his brief on file does not discuss the section of the law referred to, but relies on three decisions of the Supreme Court of the United States as upholding the doctrine that when a vein or lode crosses the side lines of the location, such side lines become the end lines on the vein so crossing, and the owner has no right to follow the vein on its dip or downward course beyond these side lines. The three cases relied upon as sustaining this proposition are, *Flagstaff Min. Co.* v. *Tarbet*, 98 U. S. 463 ; *Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 196 ; *Argentine Min. Co.* v. *Terrible Min. Co.* 122 U. S. 178. In the case of the *Flagstaff Min. Co.* v. *Tarbet*, 98 U. S. 463, the facts were that the Flagstaff Mine, as located and patented, was nearly at right angles with the Titus Claim owned

by Tarbet. The Flagstaff Company in its workings drifted some 300 feet east of the east boundary line of the Flagstaff Claim, and took out a quantity of ore claimed by Tarbet as belonging to him as the owner of the Titus Mine. (See statement of the case on p. 464.) As the Flagstaff Mine was located under the Act of 1866, which required the discoverer of a vein or lode to locate the lode only, without locating with it any surface ground, the contention of that company was, that having discovered and located the vein, it had the right to follow the vein wherever it extended, and without reference to its patented surface ground. According to the theory claimed by that company, having located a vein 2,600 feet in length, they had the right to follow the vein that distance without reference to the strike or course of the vein. Upon these facts the court decided that the Flagstaff location having been made crosswise the lode, the side lines of the location became the end lines upon the lode, and consequently the Flagstaff Company were not entitled to the ore taken from the point in controversy. There was no question raised, or that possibly could be raised, in the case as to the dip or downward course of the vein from the Flagstaff Mine into the Titus Mine from which the ore was taken. The ore was taken out 300 feet from the east boundary line of the Flagstaff, and hence could not have been upon the dip of the vein from the Flagstaff. The case and the facts in the case have no analogy whatever to the case at bar. It cannot, therefore, be an authority under the rule of construction laid down by the Supreme Court. The facts of the case of the *Iron Silver Min. Co.* v. *Elgin Min. Co.* were also essentially unlike those of the case at bar. The language used by Justice Field in that opinion clearly refutes the position assumed by the appellant that the side lines become the end lines upon the lode for all purposes when the lode in its strike or course passes through the side. It is the boundary of the lode on the surface, but not on its dip, otherwise the language of the court is meaningless when it says: "Except when in its descent the vein passes outside of them (the surface lines) and the outside portions are to lie between vertical planes drawn downward through the end lines." The language also refutes the theory of my co-counsel

for respondent in projecting new end lines for a vein crossing the location through the surface side lines. Vertical planes drawn downward through the end lines of the surface location, and continued in their own direction until they intersect such exterior parts of the vein, constitute the boundary within which the owner has the right to follow the vein on its dip, and not projected lines drawn parallel to such end lines through the vein when it crosses the side lines.

This, like the *Flagstaff Case*, it is urged, is not an authority in point. The last case relied upon by the appellant is that of *Argentine Min. Co.* v. *Terrible Min. Co.* 122 U. S. 478. From the statement of facts in this case it appears that the Adelaide Claim, owned by the plaintiff, was located northeast and southwest, and that the claim owned by the defendant crossed the Adelaide location obliquely, being located north and south. The Adelaide was the earliest location, and the vein was discovered on its dip and not on its apex. The statement of the case being not altogether clear, but from the facts recited, the dispute seemed to arise over the question as to the sufficiency or validity of the Adelaide location, it being made on the dip and not on the apex of the vein. The court held such a location good, and affirmed the judgment of the lower court. The facts of the case, as well as the principle of law applicable, were wholly unlike the case at bar, and like the other two cases relied upon, seem not to be an authority for the principle claimed by appellant. The court in this very opinion quotes with approval the language of the same court in the case of *Iron Silver Min. Co.* v. *Cheesman*, 116 U. S. 529, in which the court says: "It was conceded by all parties and the court, that the party having the apex had the right to go outside of his side lines and follow the vein." Said Mr. Justice Miller in that case, speaking for the court: "It is obvious that the vein, lode, or ledge, of which the locator may have 'the exclusive right of possession and enjoyment,' is one whose apex is found inside of his surface lines extended vertically; and this right follows such vein, though in extending downward it may depart from a perpendicular and extend laterally outside the vertical lines of the surface location." Language more apt and pertinent to the case at bar could not be used. Its fits exactly the principle for which I contend.

The case of the *Iron Silver Min. Co.* v. *Cheesman*, both in its facts, and in the application of the law to the facts, has a much closer resemblance to the case at bar than the decisions cited by appellant. In this case the court uses the following exact language: "It seems to have been conceded throughout the long trials in the case, that if plaintiff could establish the sufficiency and continuity of his Lime lode so as to make the defendants' Smuggler lode identical with it, he was entitled to recover; and on the other hand, if he did not do this he had no right to the Smuggler lode, which was in that case a different lode, outside of the vertical extension of plaintiff's side lines." (P. 531.) Nothing whatever is said in the argument of counsel on either side, or in the opinion of the court, as to the right of a locator to follow his vein on the dip or downward course, whether it crossed the end or the side lines of the location. We think, therefore, that upon authority, as well as upon the rightful construction of section 2322 of the Mining Statute, that the locator or claimant of a lode claim has the right to follow his vein or veins on their dip or incline, to the extent and length that he has the top or apex on the surface, and without regard to whether such vein or veins depart through the end or side lines of his location, and that his right can be accurately measured only by lines drawn at right angles through the vein where it crosses the side lines of the location, and continued thence in the direction of the pitch of the vein.

Appellant's brief in reply.

The primary question for decision is not " what is meant by the dip or downward course of a vein," as claimed by S. De Wolfe, Esq., because appellant's contention would cut respondent out of following at all the dip, or so-called dip of the vein. True, if appellant's claim did not obtain, then, as between the two propositions advanced as law on the part of the respondent, the question as to what is meant by the dip of the vein, viz., whether the true dip at right angles to the strike, or a course going down at an angle within the end lines extended, would become important as an argument or reason. The points made in Mr. De Wolfe's brief against the proposition advanced in the brief

of other counsel for respondent, to the effect that the lines proposed by his co-counsel are arbitrary in themselves, and involve "a legal as well as a mathematical absurdity"; and that if such theory should obtain, the right of the locator would vary with the varying angles at which the vein crossed the surface location; and that, according to the angle, the locator or owner might get less of his lode on its dip or downward course than he has on the surface or strike; and that his right on the dip of the vein would vary at every angle with which his vein crossed the surface location (points which we do not dispute), *apply with equal or greater force to counsel's own proposition.*

*First*—The course of the apex of a vein is frequently very irregular, and, in many cases, as was found to be a fact in the *Flagstaff Case*, different from the true strike or course of the vein itself, as determined by drifts. The true strike itself is seldom a straight line, and in most cases is subject to many and great variations. Lines drawn in accordance with the decision below would vary accordingly, whether the course of the apex or the true strike were taken as a base. The court in the present case drew a line at right angles with the local strike of the vein at the point where it crosses the north side line of the Amy. The exact point of departure on the south side line is not determined, but when it is, it may quite possibly be ascertained that the strike of the vein at the latter point, as well as the course of the apex, are entirely different from the strike and course on the north side; in such event the court must either (1) draw boundaries not parallel, or (2) lines of which one at least cannot be at right angles to the strike of the vein or the course of its apex. In the first case the express rules laid down in the *Iron Silver* v. *Elgin Case* will be violated; and in the other the principle adopted in the court below, and here contended for, will have to be disregarded. The difficulty would not be removed by adopting the general or average course of the vein, for that could only be determined by very extensive explorations, and it would also vary according as the average was taken within one claim only, or upon the whole length of the vein as far as known or developed. Again, it was held in the *Flagstaff* and the *Iron Silver* v. *Elgin Cases*, that the locator's rights must be decided according to the course of the apex, and not from the true dip

of the vein, which, the court say, may not be determined, perhaps, without considerable under-ground development.

*Second*—That such lines are arbitrary, is equally true of the court line in the sense that it is a line judicially established: in many cases incapable of exact determination, except by adopting an arbitrary line, and often absolutely impossible to determine if more than a single point on the vein be looked at.   Besides, it is clearly in conflict, it seems to us, with the *Iron Silver* v. *Elgin*, which absolutely prohibits the drawing of arbitrary or judicial lines, and the judicial rectification of end lines; and requires that a locator's rights be determined from the actual surface lines as surveyed.

*Third*—The other point, viz., that the owner may get less of his lode on its dip, etc., will be shown to militate against the ruling of the court below in its application to the case at bar. For, while the court below allows the respondent to follow the vein out of its side lines on its dip, between lines drawn at right angles to the course of the vein where it crosses the side line, it also expressly holds that such right is cut off the moment the vein is intersected by the vertical plane of the surveyed end line.   It will be seen at a glance that this cuts down the locator's right on the dip to a triangular space; and so the owner does not acquire "a section of the vein on its dip or downward course exactly corresponding with the length of the vein on the surface."

*Iron Silver Co* v. *Cheesman*, 116 U. S. 529, is quoted by Mr. De Wolfe.   The question as to the effect of a location crosswise of the vein was not discussed at all, the only question at issue being that of the continuity and identity of a certain vein; and the only question of law arising in it being the proper definition of what constitutes a vein, and a continuous vein.   How that case, wherein the question was not involved at all, can be in point, or even cited, when it is claimed that the cases relied upon by appellant are not relevant on account of an alleged dissimilarity in the facts, we fail to see.

All counsel claim that the cases relied on by appellant are not in point on account of an alleged dissimilarity in the facts. But let us look at the *reason* of these decisions, since it is said that the *reason of the law is the law itself*.   For as Bishop says, "though a court may find no case from the facts of which to

decide a particular question, and in this sense the question is new, if it finds a principle within which the case falls, it will proceed thereon with the same confidence as though there were thousands of decisions." (Bishop on Contracts, § 14.) We find that in the *Flagstaff* and *Iron Silver Cases,* the parties were debared from going out of their side line, in the one case on the strike and dip of the vein, and in the other on its dip. But for what reason? Because it was held in both these cases that the end of a claim, properly so called, is that which crosses the apex on the surface, whether such line be called by the surveyor or owner an end line or a side line. True, in the first case the dip question was only one of those discussed, but the conditions and limitations of the right to the dip are distinctly stated as quoted in our first brief; true, again, in the second case the vein dipped away from and not through the lines crossing the apex on the surface. But in each case the rule is given by which the end line is determined. So the application of the *Flagstaff* and *Iron Silver* decisions to a case like the present one becomes a matter of reasoning and of logic; and if the reason of the law or rule applies, the law or rule itself applies. Now, what is the end of a claim if not a line which bounds the right of a claim owner on a vein, and the vertical plane of which, extended downward, cuts off his right to follow the vein, either on its dip or on its strike.

*Argentine Min. Co.* v. *Terrible Min. Co.* similar to case at bar. In this case, despite anything claimed by any of the counsel for respondent, both the facts and the law are absolutely similar, with the exception of the fact that the Adelaide Claim (corresponding to our Non-Consolidated), was the prior location; a fact, however, which cut no figure whatever in the decision, and of a difference in degree of the angle of departure; that is to say, in the case at bar the angle between the course of the side line, and that of the average strike of the vein (which counsel agreed upon so as to have a decree entered, although the court itself did not find it), is 144 degrees. In the Argentine it is 100 degrees. Or, if we take the angle made by the course or direction of the dip and the side line, we have in the one case an angle of 54 degrees, and in the other case an angle of 10 degrees, and that is the only difference: truly, one of degree only. The vein passes out of

the side line of the Pine Claim both on its strike and on its dip; and the question arose as to the ownership of those portions of the dip, of which the apex was inside of the Pine Claim: and here we find the rules and principles of the first two cases applied, and the court says that this line, although located and surveyed as a side line, was an end line, "across which as they (it) are extended downward vertically, defendant cannot follow a vein, even if its apex or outcropping is within its surface boundaries." So here, upon reason, and principle, and authority, we have it laid down that a real end line, though surveyed for a side line, is an end line for all purposes, and not a hybrid thing; an end line at one point for one purpose, and a side line at another point for another purpose. We note particularly, that we fail to find in the opinion in the *Argentine Case* any quotations from or references to the *Iron and Silver* v. *Cheesman*, as claimed in Counselor De Wolfe's brief, such reference being only in the brief of counsel for plaintiff in error. Both counsel for respondent further seem to claim, in effect, if not in so many words, that an express and decisive ruling, made by the Supreme Court of the United States, is not to be regarded as binding and conclusive, because, forsooth, the case perhaps 'might have been determined upon some other point.

We fancy that, since the Supreme Court thought proper to make an express ruling upon a question before it, even though it might have been contented to rest its decision upon some other point, to all lower courts, at least, such ruling must be binding. But let us see. In *Iron Silver* v. *Elgin* it was expressly ruled, in the face of a dissent, that the real end lines of a claim are *those which cross the vein on the surface;* that such lines must be parallel, and *no judicial reconstruction, establishment, or projection of end lines can be made.* Nearly *five pages* of the decision are devoted to the discussion of this point. In *four lines* the court dispose of another point, perhaps conclusive by itself, and referred to in Counselor De Wolfe's brief, viz., that even the nominal end line did not include the ground in controversy. The Argentine decision is said to be not binding, because, forsooth, in the court below, there was a question raised as to the validity of a location on the dip; the claim being, as we presume, that this point in the decision is a mere *obiter dictum.* The question, however,

was expressly raised in the court below, in the most explicit manner, viz., by the defendant asking an instruction to the effect that the position of the apex gave them the dip under the apex, and its being refused by the court. (P. 480.)   A reference to the brief of the plaintiff in error in that case will show that the right to follow the dip by reason of the position of the apex was the only point made, and the only question raised on the appeal.   Besides, in disposing of the question of location, the Supreme Court say, that a valid location of the Adelaide could only have been found under the court's instructions by finding a vein therein; and it therefore assumes that there was an apex or outcropping within the surface of the Adelaide.   That branch of the case is disposed of in *fifteen lines* while *a page and a half* are devoted to the side line question, which the court approach in this way:  "But there are other grounds, equally conclusive, against the contention of the defendant below," etc.   Rather emphatic language for an *obiter*.   The other rules established in the *Elgin Case*, that no new or judicial boundary lines to a claim may be projected, but that the survey lines must control, does not, in words, touch the question here at issue, of the right to the dip; but it is, we submit, conclusive against the pretensions of all the counsel for respondent, both of which imply the drawing of new lines, or, as stated in one of the briefs, the "establishment" of new lines; the very thing prohibited by the *Elgin Case*, and the very thing contended for in the dissenting opinion in that case.   And, if the rule of the *Elgin Case* is conclusive as against both pretensions, the appellant's claim is the only one left.   Mr. De Wolfe, though contending that the cases cited by appellant have very little if any application, on page 7 of his brief, quotes from the *Iron Silver* v. *Elgin Case* what he claims to be a clear refutation of the position taken by the appellant.   Let us apply the principle of interpretation invoked by him, very correct in itself, that general expressions in an opinion are to be taken in connection with the facts of the case in which the expressions are used, and thereby limited.   The fact of the *Elgin Case* was, that the vein, instead of dipping out of the claim, through the lines which crossed the apex, as in the case at bar, dipped away from those lines.   No occasion, therefore, to state in so many words that the side line becomes the

end line on the dip as well as the strike.   Counsel's inference
from that case would be forbidden even by the force of the rule
of interpretation he invokes, as well as by the reason of the rule
of the decision which excludes judicial "establishment" of lines
and defines end lines.

Mr. De Wolfe says that the appellant does not discuss the
statute, but merely the decisions on the point.   Section 2320
was declared, in the *Flagstaff Case*, to mean that locations to
conform to the statute must be made *along* the vein, and not
*crosswise* of it; from which it follows that a location made cross-
wise of the vein, as the Amy, for instance, does not conform to
the statute, and is one not contemplated by the statute, and,
therefore, not within its purview, or entitled to the benefit of
the extralateral right given by the statute to claims which con-
form to its provisions.

DE WITT, J. — The case at bar involves the construction of
section 2322, Revised Statutes of the United States, or, rather,
the application of the facts of the case to that statute.

"Sec. 2322.   The locators of all mining locations . . . .
shall have the exclusive right of possession and enjoyment of
all . . . . veins, lodes, and ledges, throughout their entire
depth, the top or apex of which lies inside of such surface lines,
extended downward vertically, although such veins, lodes, or
ledges may so far depart from a perpendicular in their course
downward as to extend outside the vertical side lines of such
surface locations.   But their right of possession to such outside
parts of such veins or ledges shall be confined to such portions
thereof as lie between vertical planes, drawn downward, as above
described, through the end lines of their locations, so continued
in their own direction that such planes will intersect such
exterior parts of such veins or ledges."

As said by Mr. Justice Field (*Iron Silver Min. Co.* v. *Elgin
Min. Co.* 118 U. S. 206): "This section appears sufficiently clear
on its face.   There is no patent or latent ambiguity in it. . . . .
The difficulty arising from the section grows out of its application
to claims where the course of the vein is so variant from a straight
line that the end lines of the surface location are not parallel, or,
if so, are not at a right angle to the course of the vein."

We may add to these words that further difficulties arise when we are obliged to apply the statute to facts not wholly within its contemplation. If a mining location be made regularly — made so that the strike of the vein crosses the location from end line to end line, and at right angles to said end lines — there is nothing in the statute to construe or interpret. (*Flagstaff S. Min. Co.* v. *Tarbet*, 98 U. S. 469; *Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 205; *Argentine Min. Co.* v. *Terrible Min. Co.* 122 U. S. 485.) "There is no patent or latent ambiguity." But when veins or their strike cross the side lines, or a side line and end line, at all conceivable angles, difficulties confront the courts that can best be fully met by legislative aid. Until such aid is invoked; the courts must follow the statute and previous construction as closely as the varying facts permit. (*Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 208.) The history of mining has proven that the law of May 10, 1872, and amendments thereto, do not afford clear, adequate, and simple solution for some of the practical conditions that arise in the development of the mining industry. The case at bar is a notable instance. It is a first impression in this court, and all other appellate courts.

Three solutions of this interesting problem are urged upon our consideration. Neither one is absolutely free from possible criticism, in view of prior construction of the statute, applied to cases where the facts departed from the regularity, seeming to be contemplated by the law. The facts in this case we cannot ascertain have ever been before any court. We do not approach the consideration of the case with the assurance that we might possess were we able to follow a path that had heretofore been even partially opened. The situation is such that we do not feel prepared to pronounce an *ex cathedra* utterance. We are obliged to plow a furrow in virgin soil. It will be our endeavor to apply a view to the facts which shall seem to us most consonant with the true intent of the statute, and most in accord with the adjudicated cases in the United States Supreme Court, wherein the rights claimed under irregular locations have received the consideration of that court.

Without attempting scientific discussion, we believe we can give a few practical definitions, to indicate · the sense from the

miner's point of view, in which we shall use certain terms in this opinion.

Experience has shown that the precious mineral deposits, except what are commonly called "placers," as a rule lie in veins. Mr. Justice Miller (*Iron Silver Min. Co.* v. *Cheesman*, 116 U. S. 533), says: "What constitutes a lode or vein of mineral matter has been no easy thing to define. In this court no clear definition has been given. On the circuit it has been often attempted. Mr. Justice Field, in the *Eureka Case*, 4 Sawy. 311, says: 'A fissure in the earth's crust, an opening in its rocks and *strata* made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode in the judgment of geologists; but to the practical miner the fissure and its walls are only of importance as indicating the boundaries within which he may look for, and reasonably expect to find, the ore he seeks. A continuous body of mineralized rock, lying within any other well-defined boundaries on the earth's surface, and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term, as used in the acts of Congress, is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock;'" the "neighboring rock" being called in the miner's language the "country," or the "country rock."

A vein, to the miner, is a body of ore, quartz, or mineral-bearing substance, lying within the crust of the earth, bounded on each side by the country rock, greatly varying in width, and extending in length, across and through the country for greater and less distances. The direction of the vein so across and through the country is called the "strike." The direction of the vein, as it goes downward into the earth, is called the "dip." The dip, in different veins, and in the same vein sometimes, varies from a perpendicular to the earth's surface to an angle, perhaps, only a few degrees below the horizon. The dip is spoken of from three different points of view:—

1. As to its inclination from a perpendicular or a horizontal, as so many degrees from the perpendicular or from the horizontal. A vein is thus described as having a dip of 20 degrees, 30 degrees, etc.

2. As to the direction it takes from the strike or apex, by the points of the compass. If the strike were due east and west, and the vein in its course downward departed from the perpendicular at an angle, so that a perpendicular shaft sunk at the apex would leave the vein to the north of such shaft, the dip, in this point of view, would be said to be due north, or, the conditions reversed, due south. In this respect the dip — that is, the direction of the dip — is said to be, and is, at right angles to the strike.

3. The dip is again spoken of as the portions of the vein successively encountered in going down and away from the apex. The miner follows the dip when he works downward, leaving the apex further from and above him at each advance. He follows the strike when he works lengthways of the vein on a level; that is, when he is advancing along the vein, neither rising towards the surface of the ground nor descending, but going on a level with the plane of the earth's surface.

A failure to distinguish these three views of the dip in using the word sometimes leads to confusion. As we shall use the term "dip" frequently hereinafter, for the sake of definition, let us call the dip from the first point of view the inclination dip, the second the compass dip, and the third the practical dip; for this is the practical idea of the miner when he speaks of following his dip.

Under these definitions, a vein absolutely perpendicular to the plane of the earth's surface, an occurrence rarely if ever encountered, has no inclination dip or compass dip. It has only the practical dip. But in actual mining veins possess a dip from all three points of view. Keeping these definitions in view, we believe that some expressions of courts and arguments of counsel become more clear. This word "dip" is not used in the act of Congress cited above. The expression there is "course downward." "Dip" is the miner's word which has attained the significations above defined.

The highest point of such vein or body as we have described is the apex. The apex may or may not reach the surface of the ground.

The United States mineral law gives to the miner the whole every vein the apex of which lies within his surface exterior

boundaries, or which lies within perpendicular planes drawn downward indefinitely on the lines of those boundaries. The miner may follow the "dip," using the word in either of its significations, wherever it goes, provided he has the apex as a basis of operation, and that he does not cross the vertical planes of the end lines. The intent of the statute is to give the miner a section or block of the vein of a length on the strike which is equal to the length of the apex lying within the exterior vertical bounding planes of the location, and of a depth as far as he desires or is able to work downward, and that at the most remote depth attained he shall have the same number of feet on the strike as he had at the apex. (*Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 205.) It seems that such grant by the statute to the miner, in view of the geological facts and history of veins, and particularly their almost universal tendency to depart from a perpendicular in their course downward, was deemed to secure to him a more satisfactory title than he would obtain if he were compelled to locate a parallelogram on the surface of the earth, as under the Spanish mining law, and take all, and only that portion of the solid contents of the earth included in a parallelopipedon formed by dropping vertical planes downward on the line of each side of such parallelogram; and the intent of the statutory grant of section 2322 is that the miner may follow his vein on the dip, but not on the strike, if it departs from the parallelopipedon indicated.

Therefore, if the miner locates his claim regularly—that is, as the statute contemplates that he will—he has all that the statute intends to give him. (See cases cited *supra*.) If he "will not or cannot make the explorations necessary to ascertain the true course of the vein, and draws his end lines ignorantly, he must bear the consequences" (*Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 207); that is, he takes less of the apex and strike than he would obtain by a regular location, and consequently less of the dip.

But, in order for the miner to make his location in exact conformity with the intent of the law, he must know, when he fixes his exterior boundaries, what the true strike of the vein is. If he knows this, he will locate so that the strike shall pass through the middle of each end line, leaving 300 feet of surface ground on each side of the vein. But the true strike is

often ascertainable only after immense sums of money are expended in development. He has twenty days, under our statute, to determine this important matter, which may take years to fully demonstrate. If in this helpless condition the prospector commits an error of geological judgment, and upon such error he expends the toil of years, and that toil has wrought its reward, we are of the opinion that the statute should be so construed as will come the nearest to giving to him that whole section or block of the vein which we have above indicated that it is the intent that he shall have, as is consistent with the amount of apex which he has happened to secure by his surface lines, and their planes extended downward.

In the light of these views, we will proceed to examine the three theories of the end line plane, presented for our consideration.

1. The court's theory.

In this view the line that fixes the bounding plane is at right angles to the strike of the vein at the point where it leaves the Amy north side line. (On Fig. 1, the line is indicated by the letters *e, f.*) The plane drops perpendicular from that line. Counsel for appellant calls this a judicially established plane — a plane created by the court, and not by one of the location lines. Respondent's counsel, who holds this theory, vigorously protests against this term, and asserts that the plane is not judicially established, but is that intended by the statute. This, however, is only a terminological contention. Our own infirmity of language is such that we cannot better designate this line and plane than as does appellant. It is in no sense an original line or plane of the surface boundaries as located, nor a projection of, or parallel to, any of them. It is not a line fixed by location, nor ever fixed, except by the decree of the court below.

The United States Supreme Court cases, cited by all the counsel, are *Flagstaff Silver Min. Co.* v. *Tarbet*, 98 U. S. 463 (*The Flagstaff Case*); *Iron Silver Min. Co.* v. *Elgin Min. Co.* 118 U. S. 196 (*The Horse Shoe Case*); *Argentine Min. Co.* v. *Terrible Min. Co.* 122 U. S. 478.

If there be one legal principle that is announced with more clearness and frequency than all others throughout all these cases, it is that "the boundary planes shall be definitely determined by the lines of the surface location, and that they shall

not be subject to perpetual re-adjustment, according to subterranean developments made by mine workings." (*The Elgin Case*, 118 U. S. 207. See, also, 205, 206.)

Fig 1.

Scale 250 ft. to One Inch

Fig 2.

Scale. 3/8" = 100 ft.

The bounding planes must be drawn by reference to the original surface location lines, and may not be established arbitrarily at the judgment of the parties, or the courts at a later day. The original location fixes the planes.

We are forced to conclude that the court's theory is not in

accord with this principle. The plane established is purely a judicial one. It has neither parallelism nor coincidence with, or projection from, or reference to, the planes of any of the original surface lines. It is not "determined by the lines of the surface location." It was never marked on the ground by the location, nor is it referable thereto.

The whole theory of the advocate of this position is based upon the fact that he takes but one view of the dip — that which we have called the "compass dip." The dip, in this respect, is, as counsel insists, at right angles to the strike. Then, from this single point of view, he argues that, when the miner follows the dip, he may go downward from the apex only at right angles to the strike, and limited further by the planes of the original location end lines. We take his own language from his brief, as follows: —

"The judge before whom the trial was had held that lines drawn at right angles through the vein or lode, where it crossed the side lines, and these lines extended in the direction of the dip of the vein until it intersects a vertical plane drawn downward through the end lines of the location, and continued in the same direction to the place of intersection, constituted the true dip of the vein, and the part which the locator was entitled to follow in its downward course."

This is a fair and succinct statement of the position of the court below and counsel here.

We cannot but remember that this case not only determines the rights of the parties hereto, but that the decision will form an important precedent for future adjudication in the courts of this State. If we adopt the court's theory, we must abide by its legitimate consequences. The planes in this case would be drawn on the lines *e, f,* and *g, h.* (Fig. 1.) We must then follow the plane *g, h,* until it meets the plane of the east original end line, the line I, J, on the figure, extended in its own direction northerly, which latter plane, in its northward course, afterwards meets the plane *e, f.* Thus, three end line planes operate as boundaries, and the portion of the vein that the miner takes runs to a point. This result cannot be the intent of the statute. This is not the section or block of the vein in its entire depth, which the law intends to grant.

Again (in Fig. 2), on page 423, let the parallelogram, A, B, C, D, represent a location. The strike of the vein crosses the location, entering the east end line near the southeast corner, and passing out of the west end line near the northwest corner, as the line g, h, on the figure. The inclination of the dip is northerly. Counsel's westerly boundary plane on his theory would run northeasterly, at right angles to the strike at the point of departure from the west end line (the line p, t, on the figure). The section of the vein taken again runs to the point of a wedge. The miner is deprived of the portion of the vein on the dip lying north of the north side line, and between the plane of his artificially established end line (the line o, t) and the plane of the original west end line D, A, projected in its own direction. This portion of the vein it has never before been doubted, that we are aware, would belong to the owner of the apex of the vein g, h, lying between the protected planes of the located end lines.

Again, the vein may enter an end line, and pass out of the side line, as the line m, n, in Fig. 2; or take a deflection, as the lines i, r, j, or k, s, l. These are possible, and quite probable, and we believe actual, occurrences in fact. The application of counsel's theory leads to results from which we must retreat. In fact, in innumerable practical examples, where a claim is not located with absolute statutory regularity, the miner is entirely cut off from following his dip, and cut off at a greater or less depth, depending upon the inclination of the dip, and the angle at which the strike passes out of a surface line.

In the case before us the court drew the boundary plane at right angles to the strike, as it seemed to be demonstrated, at the point of departure from the north side line. The departure at the south side line is not definitely determined. If, in its course over the Amy location, the vein takes a deflection, as seems probable from the findings of the court, the court's bounding planes will not be parallel, and the portion of the vein secured will run to a point or into a fan-shaped section. If the court would draw the planes by reference to the general average strike of the vein throughout its whole extent, this could not be accomplished until extensive developments had been made on the vein over, perhaps, many locations thereon.

We are of the opinion that the view of the District Court is

not sustained by the statute or the adjudicated cases, and that its adoption threatens the security of mining titles. We are therefore obliged to disavow its doctrine.

This conclusion, however, does not determine the case. We are compelled to announce a construction of the law and the facts upon which judgment may be ordered entered below. This involves a discussion of the appellant's and respondent's theories. We will first examine the former.

2. The appellant's theory.

The controlling principle of section 2322, and the decisions thereunder, is that the miner has title to all veins, the apex of which lies within the vertical planes of his surface lines, although such veins, in their inclination on their course downward, cross the vertical plane of a side line, provided that such exterior parts lie within the projected planes of the end lines.

We are unable to escape the conclusion that the application of the appellant's theory in the case before us violates this principle. Referring to the plat (Fig. 1), it will be seen that if the Amy people go down upon their dip (using the word in any of its significations, and especially as to the compass dip) from any point on the apex, they will, at greater or less depth, depending upon the distance from the point where the apex crosses the north side line, encounter the vertical plane of that line; and if that plane is to cut them off upon the dip, and be the end line, the provisions of the statute and the universally accepted construction of the mining law are plainly subverted. Counsel holds that if the strike cross a side line, that such side line becomes an end line for all purposes. A better illustration of the revolutionary character of the theory could scarely be presented than the one at bar. But, if it be correct, we must not shrink from its necessary results. Side lines are frequently not parallel. If the strike crosses two side lines not parallel, and these are made end lines, the section of vein taken constantly narrows if the inclination be towards the small end of the location, or widens if the inclination be in the other direction. In fact all the supposititious cases applied to the court's theory develop equal disasters under the one now considered. Referring again to Fig. 2, the vein indicated by the line m, n, or v, w, will have bounding planes not parallel, but at an angle to each

other, and often a right angle.   If the compass dip were north-
easterly, the section acquired quickly runs to a point.   If it was
southwesterly, it would develop into a fan of infinite proportions,
unless we applied the two other lines of the claim as end lines,
and had four in operation.   The vein $i, r, j$, would have end
lines coincident; that is, there would be but one end line.   The
single plane of the north side line would cut off a northerly dip
in a short distance downward; or, if the dip were southerly,
would counsel call into requisition the original end lines, after
the vein passed the south side line plane, and have three end
lines taking effect?

And here we stop to observe that, in the discussion of each of
the theories, we are considering the effects of the doctrines upon
the portions of the vein on the dip lying outside of the vertical
planes of the side lines.   Those portions inside the vertical
planes of the surface lines of the location are controlled by the
general provisions of section 2322.

The appellant's view was urged in a learned argument by
counsel; but we feel that we must conclude that in the case at
bar it seems to be contrary to the theory and intent of the min-
ing law.   We are constrained to disavow the doctrine.

3. The respondent's theory.

We have arrived at our approval of this doctrine, partially
upon what the logicians call the principle of exclusion.   We
believe, however, that the position is independently sustainable
by its own reason, and upon previous construction.   Its advocate
also protests against calling his line or plane a judicially estab-
lished one, and contends that it is established by the original
surface lines; that is, by reference thereto, under the control
thereof, and in accordance therewith.   In the *Elgin Case*, 118
U. S. 206–208, we find the following, in the opinion of Mr.
Justice Field:   "The surface side lines extended downward ver-
tically determine the extent of the claim, except when in its
descent the vein passes outside of them, and the outside portions
are to lie between vertical planes drawn downward through the
end lines.   This means the end lines of the surface location, for
all locations are measured on the surface. . . . . It is better that
the boundary planes should be definitely determined by the lines
of the surface location than that they should be subject to per-

petual re-adjustment, according to subterranean developments made by mine workings. . . . . The provision of the statute, that the locator is entitled throughout their entire depth to all the veins, lodes, or ledges, the top or apex of which lies inside the surface lines of his location, tends strongly to show that the end lines marked on the ground must control. . . . . This view of the controlling effect of the end lines of the surface location is also sustained by the decision of this court in the *Flagstaff Case.*"

From those utterances, and from the tenor of this case, as well as the *Flagstaff* and *Argentine Cases,* we believe that we may conclude that the bounding planes, sought to be applied in the respondent's theory to the facts of the case at bar, may properly be said to be "determined by the lines of the surface location."

In the *Flagstaff Case* and the *Argentine Case* the strike of the vein was at right angles to the side line of the location, or, as the court in the former case says, practically so, and, for the purposes of the decision, treated as such. Therefore, in those cases, the vital matter before the court was not a question of the dip, but rather one of the strike, and the spirit of those cases seems to us to be that, when the strike passes out of the location through any surface line, that surface line, and its vertical plane, cut off the strike, and the miner may not follow the strike beyond such plane.

We are aware that there is language used in the *Argentine Case* that looks towards the adoption of the appellant's theory herein, in the sense that the side line, under the circumstances of the case at bar, must be an end line to limit, by its vertical plane, the dip, as well as to stop the pursuit of the strike. But there is a vital difference between the facts of the *Argentine Case* and those now before us, and the language therein must be viewed in connection with the facts in the case before the learned justice. Chief Justice Marshall, in *Cohens* v. *Virginia,* 6 Wheat. 399, says: "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The ques-

tion actually before the court is investigated with care and considered in its full extent.   Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

Mr. Justice Field is the judicial father of the mining law of the United States.   By his legal learning, and his practical knowledge of mining, he has illumined the path of the history of mining adjudications.   His words in the *Argentine Case*, and those of Mr. Justice Bradley in the *Flagstaff Case*, were not spoken of facts such as those now before this court; and we cannot consent that those distinguished jurists would admit that their language sanctions the doctrine that appellant applies to the Amy-Non-Consolidated situation.

Turning to the *Horse Shoe Case*, the other of the three leading cases cited, the facts were also entirely variant from those now before us.

These three United States cases have compelled that court to endeavor to cast into the Procrustean bed of the statute indi-. viduals that strained the mould into which they were forced. But we believe that we may legitimately conclude from those cases that, in the facts now before us, the principle is that the north side line of the Amy terminates the strike of the vein, and that the dip must be controlled by the planes of the original end lines.   The Amy people may follow their dip north of their north side line, but only as it lies between the planes of their end lines, as below considered.   The object of parallelism in the end lines is that the locator may have his full section of the lode in its entire depth.   But the determination of the strike of the Amy at a point on the side line deprives them of the dip northwest of that point, because the dip, in that portion, lies under the apex of the Non-Consolidated.   The law intends that the plane of the end line shall operate as a boundary to the dip, and so operate at the point where the strike is ended.   If the strike reached the original end line, as in a regular location, the bounding plane would there operate upon the dip.   If the strike, by reason of its going out of a side line, falls short of reaching the original end line plane, that plane must take effect where the strike in fact ends; that is, at a point on the side line

(point *e*, Fig. 1); and, if it takes effect there, its parallelism must not be destroyed. We therefore have the bounding plane operating at the point where the apex leaves the north side line, and operating parallel to the east end line, and retaining its parallelism as originally marked on the ground. It is not a new line or plane, or one judicially constructed. It is determined by the location lines on the surface. There is never any re-adjustment according to subsequent developments. The parallelism of the end line planes is fixed by location, and never varies. The point of departure of the strike from the surface lines fixes the point where the end line plane is to perform its functions, whether that departure be at an end line, as contemplated by the statute, or whether accident has fixed it at a point on a side line.

Complications are soluble upon this theory. The intent of the statute seems to be secured.

We will notice some objections made to this doctrine, but which we believe are not sustainable. It is urged that the principle will not apply to a vein, the strike of which crosses the location at exact right angles to the side lines. But here there would be no dip in question. The side line would bound the strike, as in the *Flagstaff Case*.

Again, it is suggested the Non-Consolidated surface location happens to be almost exactly parallel in its lines to the Amy. If the Non-Consolidated had been located with its end lines at right angles to the strike of the vein in the Non-Consolidated ground, that is, parallel to the court's line (Fig. 1), then it is objected that, if the Non-Consolidated go down on the dip, within the planes of such end lines, and the Amy go down within the planes as we define them, a collision would occur under-ground. If so, such conflict would be adjustable by priority of title.

Again, it is urged that the Amy has an apex on the surface of a length, as it runs from south to north side line, but that under this theory, at a depth, the strike is shorter, and only of a length equal to the shortest distance between the bounding planes. This objection is based upon an error in the geometrical view, as may readily be shown by descriptive demonstration. A level run on the vein at one hundred, five hundred, one thou-

sand, or any number of feet in depth, would be parallel to the strike at the highest point, and of equal length.

Of the three theories which have been presented to us for application to this case, we approve and adopt the last considered.

In accordance with this view, let the judgment entered in the District Court be modified in this particular: that the plane bounding the portions of the dip of the Amy vein, lying north of and outside of the Amy north side line, shall be drawn from the point where the apex crosses that north side line, and in a direction north, 3 degrees west.

The case is remanded, with directions to the District Court to enter judgment accordingly.

BLAKE, C. J., and HARWOOD, J., concur.