FITZGERALD ET AL., RESPONDENT, *v.* CLARK ET AL., APPELLANT.

[Submitted October 4, 1895. Decided November 11, 1895.]

MINES AND MINING—*Strike—Apex—Right to follow dip—Section 2322 U. S. Rev. Statutes construed.*—The intent of section 2322 U. S. Revised Statutes providing that the locators of all mining locations shall have the exclusive right of possession and enjoyment of all veins, throughout their entire depth, the apex of which lies within the vertical planes of the lines of the surface location, although such veins in their course downward cross the vertical plane of a side line, provided, that such exterior parts lie within the projected planes of the end lines, is to give a miner as much vein in length on the strike, at all depths to which he may go on the dip, as he has length of apex within his surface lines, and therefore, where the apex of a vein crosses the east end line of a claim, as located, and passes out of the claim at a point on the south side line and extends into an adjoining claim, and with the dip of the vein to the south so that it crosses the vertical plane of the south side line the owners of the claim may follow the vein on its dip south of their south side line, confining their operations on the strike between the vertical plane of the east end line and a vertical plane parallel thereto drawn downward at the point where the apex of the vein intersects the south side line. (*King* v. *Amy & Silversmith Mining Co.,* 9 Mont. 543, affirmed.)

SAME—*Continuous vein—Instructions.*—In an action to recover the value of ore taken by defendants from a portion of a vein, lying within the defendant's claim, but having its apex within plaintiffs' claim, the defendants contending that a continuous vein, the apex of which was wholly upon their ground, connected with the ore bodies, it was proper to charge the jury that such connection "is made by following a continuous streak or body of quartz or ore, or by passing through vein matter" and to refuse to charge that that such connection would be made "by following such material or indication as a practical miner would follow with the expectation of finding ore."

INSTRUCTIONS—*Burden of proof.*—It cannot be predicated of an instruction beginning with the words "Plaintiffs having the burden of proof, they must establish the material allegation of their complaint by a preponderance of evidence," that the court had assumed that a right of recovery had been established.

MINES AND MINING—*Market value of ore—Instruction.*—In charging the jury as to the value of the ore taken from plaintiff's vein by defendants while working within the boundaries of their own claim, an instruction that the jury should take as a basis

therefor "the market value of such ores on the dump after deducting the cost of mining and hoisting" is not objectionable in that it does not also exclude the cost of smelting and reducing the ore, since the "market value" is of necessity the value of the bullion less the cost of extracting it from the ore.

INSTRUCTIONS—It is not error to refuse an instruction wholly unwarranted by the facts.

MINES AND MINING—*Fault in vein—Evidence.*—Testimony as to the existence of a fault in a vein on defendants' claim, which, in the opinion of the witness, is an extension of another claim in which the same condition exists, is inadmissible in the absence of evidence of continuity of the fault.

NEW TRIAL—*Polling jury.*—Failure of a bailiff to, notify appellants' counsel when the jury had agreed upon a verdict, as he had promised to do, whereby counsel were deprived of an opportunity to poll the jury, is not ground for reversal.

SAME—*Affidavit of juror—Equity case.*—In an equity case, where the findings of the jury are advisory, the trial court may, on motion for new trial, disregard the affidavit of a juror, given to impeach his own verdict, to the effect that he was ill and agreed to the verdict in order to get discharged, where the court had no intimation of his illness until the making of the affidavit.

*Appeal from Second Judicial District, Silver Bow County.*

ACTION to recover the value of ore. The cause was tried before McHATTON, J. Plaintiff had judgment below. Affirmed.

Statement of the case by the justice delivering the opinion.

The respondents own an undivided two-thirds interest in the Niagara quartz lode mining claim. The appellant William A. Clark owns the other one-third in said claim. The appellants own the Black Rock quartz lode mining claim. The surface relations of the two mining claims are indicated upon the annexed diagram, marked "Figure 1."

Fig. 1.

It will be more convenient in this statement and in the opinion to sometimes speak of the parties to this appeal as the "Black Rock" and the "Niagara," instead of using their names, or the terms "appellants" and "respondents."

The north side line of the Black Rock claim is the south side line of the Niagara claim. We do not purport to exactly indicate on the diagram the position of the apex of the vein as it traverses the two claims. The dotted line simply indicates the general course of the vein, and, as far as the purposes of this decision are concerned, is correct. The apex moves across the Black Rock claim from west to east, and crosses the boundary line between the two claims at a point marked A on the diagram, which is, as the jury found, 513 feet westerly from the northeast corner of the Black Rock, which corner is marked B on the diagram. The east line of the Niagara was originally at the place marked B D. In some controversy between the Niagara and the Raymond claim to the east a compromise was made by which the boundary between those two claims was placed at a point about 224 feet westerly from the original Niagara east end line. This was called the "compromise line," and would be at about the place as marked on the diagram E F. This, however, is not important in the present suit. The parallelism of the end lines of the Niagara was not disturbed by the Raymond compromise. The apex and strike of the vein, having crossed into the Niagara ground at the point marked A, continue easterly, and pass wholly out of the Niagara ground through the easterly end line thereof. It is immaterial whether that end line is the line B D or E F. The strike and apex pass through each of them. The vein dips to the south. The portion of the apex which is represented by the line A G is wholly within the Niagara surface lines. The portion of the vein below this part of the apex, in its downward course into the earth,—that is to say, on its dip to the south,—passes under the line H B, which is the north side line of the Black Rock, and the south side line of the Niagara. We call this line a side line at present simply for convenience; and not as a pre-statement of our views as to whether it must be

considered a side line or an end line. On this portion of the vein on the dip lying under the apex A G the ore was found (marked on the diagram "Ore Bodies") which was the subject of this action. The defendant the Black Rock owner entered upon this portion of the vein, and extracted the ore from the place as marked on the diagram. There was a contention in the case that these ore bodies were upon a vein other than that which apexed (if we may invent this verb) at A G; that is to say, upon another vein, the apex of which was on the Black Rock ground. But the findings were adverse to the Black Rock in this matter. We will not review that contention. For the purposes of this decision the ore bodies in question were upon the vein the apex of which is indicated by the line A G, which lies wholly within the Niagara surface lines. The plaintiffs, being the owners of an undivided two-thirds interest in the Niagara, brought this action against the defendants to recover the two-thirds value of the ores so taken from the place above described. Plaintiffs obtained judgment for $27,-242.54. The jury also found that the apex of the vein in controversy passed entirely within the lines of the Niagara lode at the point marked A. Judgment was to this effect, as well as for the amount of money named above. A motion for a new trial was denied. The Black Rock people appeal from the judgment and from the order denying the new trial.

*Smith & Word*, for Appellants.

I. The first requirement of section 2320, Revised Statutes of the United States, in respect to the rights of locators, is that the end lines of the claim *shall be* parallel, and that so much of the vein as lies between planes drawn vertically downward through the end lines, or until the ledge is intersected by such planes, belongs to the locator on its dip into the earth. The lines as designated by the locator as *end lines* of his location are not necessarily such. (*Iron Silver Mining Company* v. *Elgin Mining Co.*, 118 U. S. 196; 14 Fed. Rep. 377; *Flagstaff Mining Co.* v. *Tarbett*, 98 U. S. 463; *Terrible Mining Co.* v. *Argentine Mining Co.*, 122 U. S. 478; *King* v.

*Amy & Silversmith*, 152 U. S. 222; *Tombstone Mining Co.* v. *Way Up Mining Co.*, 25 Pac. 794.) From the foregoing authorities it will be seen that often those lines which are designated as side lines become end lines, by reason of the fact that the vein or ledge crosses them and departs from the claim never to return inside the surface boundaries. It frequently happens that the vein crosses lines which are not parallel, and which, by reason of the ledge crossing them and departing from the claim, become end lines. The law does not require parallelism in the side lines of a claim. If then side lines which are not parallel become end lines by reason of having been laid across the strike of the vein, has the claimant any extra lateral rights? In the Amy and Silversmith case, recently before the supreme court, it so happened that the side lines of the claim were parallel, and in fact they were more nearly parallel to the general strike of the vein or ledge than the original end lines, but the supreme court held that the side lines became the end lines and that the owners had no extra lateral rights on their vein, but were confined to the amount included within planes passed vertically downward through the surface lines of the Amy location. What rights then can a claimant have whose location is so made that one of the lines he designates as an end line, and one of his side lines cross the vein or ledge so that the same departs from the claim through one end line and one side line? This question would seem to be answered by section 2322, Revised Statutes of the United States, which says: "But this right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described through the end lines of their location so continued in their own direction that such planes will intersect such veins or ledges." As the end lines in the case at bar intersect each other almost at right angles, the planes drawn down vertically through them would also intersect at the same angle, and respondents' rights would be restricted to the surface lines of their claim. The end lines of the "Niagara" or rather the surface lines of the "Niagara" crossed by

the vein or lode are not parallel.   Have the respondents then any extra-lateral or extra-territorial rights?   This question is answered in the negative by the following authorities: *Iron Silver Mining Co.* v. *Elgin Mining Co.*, 118 U. S. 196; 14 Fed. Rep. 377; *Montana Company, Limited,* v. *Clark*, 42 Fed. Rep. 626; *King* v. *Amy & Silversmith Consolidated Co.*, 152 U. S. 222; *Colorado Central Consolidated Co.* v. *Tunck*, 50 Fed. Rep. 888; *Tombstone Mill & Mining Co.* v. *Way Up Mining Co.*, 25 Pac. 794.

II.   The court instructed the jury that if the whole of the apex of the "Niagara" vein or ledge appeared at any point within the surface location of the "Niagara" claim, then the respondent had a right to follow it on its dip beneath the surface of the "Black Rock" claim, and this instruction was given in view of the pleadings and without limitation as to the question of parallel end lines.   This instruction is fatally bad, and was greatly prejudicial to the rights of appellant, and misleading to the jury.

III.   The court erred to the prejudice of appellant, when it struck out that part of the instruction by which the jury would have been told that the defendant had a right, in following the Stoner vein, to follow such material or indication of a vein as a practical miner would follow with expectation of finding ore. In view of the other instructions of the court as to what would constitute a vein, it seems the matter stricken out should have been given to the jury.

IV.   In the last modification to No. 15, it seems the court assumes the respondents have established a right to recover. Such assumption would be erroneous as taking the question of whether or not respondents were entitled to recover from the consideration of the jury.

V.   Instruction No. 16 is erroneous.   Respondents and appellant were and are tenants in common in the "Niagara" vein or lode; and, admitting for sake of argument that the respondents have a right to an accounting and to two-thirds of the ore extracted from the vein, the appellant was there rightfully on his own premises as tenant in common; he was not a

trespasser, and is entitled to his actual expenses in extracting and treating the ore, provided the expenses are reasonable and as low as such work could be done. (*Hayne* v. *Gould*, 54 Fed. 951; *McCord* v. *Oakland Quicksilver Mining Co.*, 64 Cal. 134; Fulmers' Appeal, 18 A. 493; *Graham* v. *Pierce*, 19 Grat. (Va.) 28.)

VI.   It seems almost from a casual observation of instruction No. 6, as requested by counsel for appellant, that the refusal of the court to give same was error, for nowhere is the question therein presented given to the jury, and the question of the right to follow the vein or ledge across a side line intersected by such vein is entirely taken from the jury, and they are practically told that lines crossed by the vein are not end lines, and this in the teeth of the construction of the law by the supreme court of the United States.

VII.   The court erred in rejecting the testimony of the witness Hall, an expert miner, by whom the appellants offered to prove that the Black Rock vein was a part of the Rainbow lode. The court refused to receive this evidence, and excluded it from the jury, for the reason, as stated by the court, that he would not permit witnesses called as experts to give their opinion of the geological formation and characteristics of the Black Rock lode or vein by comparison with outside or adjacent properties and formations.   In this the court committed a serious injury to the cause of the appellant, for it is a well-settled rule that experts, as geologists and other scientists, are always permitted to give their opinions and the reasons therefor, and in presenting their reasons for their opinions may give the facts as observed by them under similar conditions in adjacent grounds or localities. (*Stambaugh* v. *Smith*, 23 Ohio St. 595; *Lincoln* v. *Taunton Copper Co.*, 9 Allen 101-2; *Williams* v. *Taunton*, 125 Mass. 34; *Hartford Insurance Co.* v. *Harmer*, 59 Am. Dec. 684.)

*George Haldorn*, also for Appellant.

I.   Appellant was given no opportunity to poll the jury, the verdict being rendered near midnight, though arrange-

ments had been made with counsel for appellant to be notified, the court having been adjourned until the following Monday and no order made as to a sealed verdict. It is reversible error to refuse or neglect to allow either party to poll the jury. (Wait's Prac., vol. 3, page 193-4; *Labor* v. *Coplin*, 4 N. Y. 547; Abbott's Trial Brief, 178, and cases cited; *Riggs* v. *Cook*, 46 Am. Dec. 473, and cases cited; *Noval* v. *Duval*, 11 Am. Rep. 413; *Root* v. *Sherwood*, 5 Am. Dec. 191; *Fox* v. *Smith*, 3 Cow. 23; *Jackson* v. *Hawks*, 3 Wen. 619; *Laurence* v. *Stearns*, 11 Pick. 501; *James* v. *State*, 30 R. 496; Thompson on Trials, p. 5; Rev. St. Mont., § 270, 1st div. Code Civ. Procedure; Abbott's Trial Brief, p. 181.) It being conceded defendant had a right to poll the jury, was that right waived by the absence of himself or counsel? An examination of all the above cited authorities, as well as those following, shows that when the jury returns into court with a verdict during the sessions of the court, it is the duty of counsel or party to be present, without notice, but where court had adjourned counsel must make arrangements to be notified (as was done) otherwise it would necessitate counsel remaining physically in the court room all night, Sundays and holidays, watching the jury, even when he knew the judge was not present, or it might be, out of town. The provision of law with reference to sealed verdicts, clearly shows that when court adjourns for the day, counsel or parties are not expected to be present when court is not in session. (Sec. 269, Code of Civil Procedure, 1887.) On the rendition of the sealed verdict, counsel must be present without notice, because such rendition cannot be made before the session to which court has adjourned. Even an agreement by counsel that a sealed verdict be rendered, does not relieve the jury from appearing to be polled. (*Riggs* v. *Bias* (Kan.) 24 Pac. 56.) Counsel must attend sessions of court to poll jury—must not delay court by absence during sessions of court. (*Stronger* v. *Sample*, 24 Pac. 425, *Bishop* v. *Mugler*, 5 Pac. 756; *Torgue* v. *Cavillo*, 25 Pac. 525.) Section 267 of our code requires counsel or parties to be present or notified when jury comes in for addi-

tional instructions, etc. *A fortiori*, should not counsel or parties be notified when verdict is rendered? While generally, affidavits of jurors will not be received to impeach their verdict for anything which is essentially inherent in the verdict itself, yet, the rule is, that to show misconduct of a party or officer in charge of the jury, they are admissible. (Merriam on Juries, 432-449; 16 Am. & Eng. Enc. of Law, 654; *Reins* v. *People*, 30 Ill. 256; *Perry* v. *Battey*, 12 Kan. 539; *Wade* v. *Ordway*, 57 Tenn. 229; *Anschicks* v. *State*, 6 Tex. App. 524; *Ritchie* v. *Holbrooke*, 7 S. & R. 458; *Hawkins* v. *La Print*, 60, 29 La. 134; *Huston* v. *Vail*, 51 Ind. 299; *Taylor & Everett*, 2 How. Pr. 23; *Thomas* v. *Chapman*, 45 Barb. 18.) In this case the use of affidavits of jurors is not directly to impeach the verdict, but to show misconduct and coercion on the part of the officer in charge of the jury.

*John F. Forbis*, for Respondent.

I. What is the law with reference to extra-lateral rights, where the vein crosses one end line and one side line? This court in the Amy-Silversmith case, 9 Mont. 543, laid down a just and equitable rule. Until that decision has been reviewed and reversed in its entire scope we think it the wisest course in this court to adhere to it, unless the court should have changed its views upon the subject. The reversal of this case by the supreme court of the United States, we confess, left it doubtful as to what would or should be the ruling in a case like the one at bar. But very recently that court has expressly announced that the decisions heretofore made by it have been in cases where the vein was crosswise of the location, and have said that a case like the present has not been decided by that court. (*Last Chance Mining Co.* v. *Tyler Mining Co.*, 157 U. S. 695.) In view of this declaration the decision of this court in the Amy-Silversmith case may be treated as an authority in favor of extra-territorial rights as claimed by us. Unreversed there could be no question as to where this court would stand upon the question. Modified as

it is by the supreme court of the United States, it yet remains as the opinion of this court upon the question. In a case nearly identical with the facts of the case at bar it was held that extra-lateral rights existed. (*Del Monte Mining Co.* v. *New York & Last Chance Mining Co.* 66 Fed. 212; *Tyler Mining Co.* v. *Last Chance Mining Co.*, 61 Fed. 557.)

II. The instructions complained of by the defendants were not excepted to. There is not an exception to a single specific instruction. In one case there are three instructions and one modification specified as error, and these all in the conjunctive. In another case two instructions and a modification excepted to in a like manner. And again all instructions refused, without even numbering them, and embraced in one general description, as "refused" are excepted to. Under the uniform rulings of this court these exceptions were insufficient. (*Griswold* v. *Boley*, 1 Mont. 545; *Gum* v. *Murray*, 6 Mont. 10; *Woods* v. *Berry*, 7 Mont. 195; *Alderson* v. *Marshall*, Id. 288; *Gassert* v. *Bogk*, Id. 585; *Kleinschmidt* v. *McDermott*, 12 Mont. 309; *State* v. *Black*, 15 Mont. 143; *Raymond* v. *Thexton*, 7 Mont. 304.)

III. The modification of instruction number eleven, by striking out the words, "or by following such materials or indications as a practical miner would follow with the expectation of finding ore," was highly proper. The proper rule in such cases is to tell the jury what character of vein or mineral connection would justify them in finding that the vein was continuous. This was done by the court in this instruction very plainly, and the defendants were given the benefit of the law relative thereto. The portion of the instruction stricken out does not correctly state the law, and the court under the facts of the case could not see that it would have any enlightening benefit to the jury. What a practical miner would do is a very uncertain element. One miner might do one thing and another equally as practical might do the reverse, and the phrase used in the instruction is entirely too vague and uncertain to mean anything. Besides the use of the words "such material or indications" is utterly meaningless. (*Iron Silver Mining Co.* v. *Cheeseman*, 116 U. S. 529.)

IV.   The instructions relating to the measure of damages applicable to cases where one tenant in common extracts ores from the property held in common, did not violate the rule invoked by the appellant; for the instructions throughout allowed to the defendants the actual and necessary costs of mining and hoisting the ore.   Counsel say in their brief, that he "is entitled to his actual expenses in extracting and treating the ore, provided the expenses are reasonable, and as low as such work could be done."   The instructions certainly take the same view of the subject.   The market value on the dump was the value of the ore in its then condition, and the expense of working must be deducted to ascertain its true market value.   Under the provisions of Section 1295, Fifth Division of the Compiled Statutes, the defendants were as much trespassers as if they had not owned any interest in the property in question, and must account as any other trespasser.   (*Howard* v. *Albro*, 20 Atl. 834; *Almy* v. *Daniels*, 4 Atl. 753; *Fulmer's Appeal*, 128 Pa. St. 24.)   There are different rules laid down for ascertaining the damages for ores or coal mined by a trespasser.   In some cases the trespasser is not allowed for the costs of extraction, but we think the true rule and the one most favorable to defendants was set forth in the instructions.   *Baker* v. *Wheeler*, 24 Am. Dec., note 77, *et seq.; The McLean Co. Coal Co.* v. *Long*, 81 Ill. 359, 10 M. R. 193; *Robertson* v. *Jones*, 71 Ill. 405, 10 M. R. 190; *In United Merthyr C. C.*, 10 M. R. 153; *Ill. & St. L. R. R. Co.* v. *Ogle*, 82 Ill. 627; 10 M. R. 190; *Ege* v. *Kille*, 84 Pa. St. 333, 10 M. R. 212; *Clowser* v. *Joplin Mining Co.*, 10 M. R. 222; *Foster* v. *McLean*, 10 M. R. 263; *Austin* v. *Hunkville C. & M. Co.*, 72 Mo 535, 9 M. R. 115.)

V.   The defendants complain of the action of the court in receiving the verdict in the absence of counsel for defendants, for the reason that counsel had no opportunity to poll the jury. Had Mr. Haldorn been present and the court had refused to allow him to poll the jury, he would have had ground for complaint.   This is the extent to which the authorities go, which are cited by him.   We know of no authority that requires a

court to send for counsel in a civil case before receiving a verdict.    The law makes it the duty of the counsel to be present, and that whether the court is actually in session, or in recess awaiting the verdict of a jury.    We believe the court will find the authorities uniform upon this question.  (*Strowger* v. *Sample*, 24 Pac. 425; *Reilly* v. *Bader*, 48 N. W. 909; *Seaton* v. *Smith*, 25 Pac. 222; *Torque* v. *Carillo*, 25 Pac. 526; *Walker* v. *Daily*, 54 N. W. 344; 76 Cal. 573; § 269, Code of Civil Procedure.)

VI.    It was proper for the court to disregard the affidavit of the juror Hess in considering the motion for a new trial. (Thompson's Merriam on Juries, § 441; Thompson on Trials, § 2618.)

DE WITT, J.—This case was tried in the district court after the decision of *King* v. *Amy & Silversmith Min. Co.*, 9 Mont. 543, and before the reversal of that decision on appeal to the United States supreme court (152 U. S. 222, 14 Sup. Ct. 510).    The case was tried upon the assumption that the law as attempted to be declared in 9 Mont. was correct.    The district court instructed the jury upon this theory, and the judgment gave to the Niagara people the two-thirds value of the ore taken by the Black Rock east of the point where the apex of the vein passed entirely into the Niagara ground, namely, point A on the diagram.    No exceptions to these instructions were preserved or specified so that they can now be reviewed. But since the trial of the case at bar, and perfecting the appeal to this court, the United States supreme court has reversed our decision in the Amy & Silversmith case.

The Black Rock people argue that, although they are not now in a position to urge error in the instructions (that is to say, that which they now claim to be error by reason of the United States supreme court decision of the Amy & Silversmith case) still they can raise the same point upon the ground that the pleadings do not support the judgment.    Their argument to this effect is that the pleadings, alleging the facts as detailed in the statement above, do not warrant the judgment

under the law as decided by the United States supreme court in the Amy & Silversmith case. In other words, the Black Rock contends that under that decision, if the Niagara apex leaves the Niagara claim through a side line, as it does, the Niagara is limited, in following down the dip of the vein, to a perpendicular plane drawn downward through that side line,— the line H B on the diagram; whereas the district court did not so limit them, but held in its judgment that the Niagara could take the ore on the dip of the vein under the apex A G, and east of the point A, although such vein on its dip extended southward under the Black Rock north side line. That is to say, the district court gave judgment in accordance with the law of the Amy & Silversmith case, in 9 Mont., which was declared not to be the law in the Amy & Silversmith case, in 152 U. S. We will concede to the Black Rock that this question is raised by the pleadings, and we shall proceed to determine whether the Niagara or the Black Rock owns the ore in dispute taken from the place marked "Ore Bodies" on the diagram.

We shall not renew the discussion of the cases upon this question decided by the United States supreme court prior to May 21, 1890, the date of our decision of the Amy & Silversmith case. Our best construction of those decisions is found in our opinion in that case. We there met the problem which had for years engaged the earnest attention of lawyers who had to do with mining litigation,—i. e. the preservation of the intent of the mining statutes when they are applied to a location in which exploration has demonstrated that the apex and strike of the vein do not pass through both end lines of the location. We gave our best endeavor and research to that decision, and arrived at a result which we were willing to concede was not wholly in accord with the decisions of the United States supreme court upon that subject, but which we believed could, with a very little effort, be reconciled with those decisions, and which we were wholly satisfied was the only practicable working solution of the problem in all its phases, and which we were also wholly satisfied was fully within the intent

of the United States mining laws. Even with the profound respect which we, in common with all courts, entertain for the decisions of the United States supreme court, we think that there is no impropriety in saying, and that it is due to ourselves to say, that, the longer we observe the daily operation of the mining laws in practical affairs, the more satisfied are we that our decision of the Amy & Silversmith case was correct. We are strengthened in this opinion by the views of other courts, to which we shall hereinafter refer. But the United States supreme court is the court of last resort upon this subject, and our opinions, as a rule of decision, must be abandoned if they are in conflict with the declarations of the superior tribunal. If that court had given no further utterance upon this subject since its decision of the Amy & Silversmith case, we should feel that we must, however reluctantly, desert the principle which we sought to maintain in that case. But, as will be seen in the review of the cases below, that distinguished tribunal has given a hint that it is willing to reconsider the principle involved. Upon that hint we feel that we are justified in approaching the subject much as if it were *res integra*, and without subjecting ourselves to the criticism of judicial insubordination.

But to the subject in hand. As noted above, we shall not go to the decisions back of our Amy & Silversmith opinion. 9 Mont. 543. We are satisfied with that discussion of the subject, and the review of the authorities up to that date. We shall take up the subject as it has been developed since our decision in that case. The history of the discussion is found, chronologically, in the following cases : *King* v. *Amy & Silversmith Con. Min. Co.* (May 21, 1890) 9 Mont. 543, 24 Pac. 200; *Tyler Mining Co.* v. *Sweeney* (January 16, 1893) 4 C. C. A. 329, 54 Fed. 284; *King* v. *Amy & Silversmith Mining Co.* (March 5, 1894) 152 U. S. 222, 14 Sup. Ct. 510; *Last Chance Mining Co.* v. *Tyler Mining Co.* (April 9, 1894) 9 C. C. A. 613, 61 Fed. 557; *Consolidated Wyoming Gold Mining Co.* v. *Champion Mining Co.* 63 Fed. 540; *Del Monte Mining & Milling Co.* v. *New York & L. & C. Mining Co.* (March 13,

1895) 66 Fed. 212; *Last Chance Mining Co.* v. *Tyler Mining Co.* (April 15, 1895) 157 U. S. 683, 15 Sup. Ct. 733.

The cases cited above in 4 C. C. A., 54 Fed. 9 C. C. A., 61 Fed. and 157 U. S., 15 Sup. Ct., are different appeals and discussions of the same case. In the Amy & Silversmith case the apex of the vein crossed the claim as indicated in the diagram used in that opinion, and which is reproduced here, marked "Figure 2 : "

The vein dipped to the north. We held that the right of the Amy & Silversmith to follow the vein on the dip was bounded by a perpendicular plane extending into the earth at the point where the apex crossed the Amy & Silversmith north side line, the point marked *e* on the diagram, Fig. 2, and which plane was parallel to the end lines of the Amy & Silversmith claim, and extending north of the Amy & Silversmith north side line. We quoted section 2322, Rev. St. U. S., which is as follows : "The locators of all mining locations * * * shall have the exclusive right of possession and enjoyment of all * * * veins, lodes and ledges, throughout their entire depth, the top or apex of which lies inside of such surface lines, extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession

to such outside parts of such veins. or ledges shall be confined to such portions thereof as lie between vertical planes, drawn downward, as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins of ledges.''

We then said:    ''As said by Mr. Justice Field. (*Iron Silver Min. Co.* v. *Elgin Mining & Smelting Co.*, 118 U. S. 206, 6 Sup. Ct. 1177): 'This section appears sufficiently clear on its face.    There is no patent or latent ambiguity in it.    *    *    * The difficulty arising from the section grows out of its application to claims where the course of the vein is so variant from a straight line that the end lines of the surface location are not parallel, or, if so, are not at a right angle to the course of the vein.'    We may add to these words that further difficulties arise when we are obliged to apply the statute to facts not wholly within its contemplation. If a mining location be made regularly,—made so that the strike of the vein crosses the location from end line to end line, and at right angles to said end lines,—there is nothing in the statute to construe or interpret. (*Mining Co.* v. *Tarbet*, 98 U. S. 469; *Iron Silver Min. Co.* v. *Elgin Mining & Smelting Co.*, 118 U. S. 205, 6 Sup. Ct. 1177; *Argentine Min. Co.* v. *Terrible Min. Co.*, 122 U. S. 485, 7 Sup. Ct. 1356.) 'There is no patent or latent ambiguity.' But when veins or their strikes cross the side lines, or a side line and end line, at all conceivable angles, difficulties confront the courts that can be best met by legislative aid.    Until such aid is invoked, the courts must follow the statute and previous construction as closely as the varying facts will permit.    (*Iron Silver Min. Co.* v. *Elgin Mining & Smelting Co.*, 118 U. S. 208, 6 Sup. Ct. 1177.) The history of mining has proven that the law of May 10, 1872, and amendments thereto, do not afford clear, adequate, and simple solution for some of the practical conditions that arise in the development of the mining industry.    The case at bar is a notable instance.    It is a first impression in this court, and all other appellate courts.''

After stating what we understood to be the meaning of the words ''dip,'' ''strike,'' etc., as used by miners and in the

decisions, we further said: ''The United States mineral law gives to the miner the whole of every vein the apex of which lies within his surface exterior boundaries, or which lies within perpendicular planes drawn downward indefinitely on the lines of those boundaries. The miner may follow the dip * * * wherever it goes, provided he has the apex as a basis of operation, and that he does not cross the vertical planes of the end lines. The intent of the statute is to give the miner a section or block of the vein of a length on the strike which is equal to the length of the apex lying within the exterior vertical bounding planes of the location, and of a depth as far as he desires, or is able to work downward; and at the most remote depth attained he shall have the same number of feet on the strike as he had at the apex. (*Iron Silver Min. Co.* v. *Elgin Mining & Smelting Co.*, 118 U. S. 205, 6 Sup. Ct. 1177.)''

We have always been of opinion that this is the keynote of the interpretation of section 2322, Rev. St. U. S.; that is to say, if the miner has the apex in his location, he is to have the vein, and he has as much length of the vein on the strike, no matter how deep he may go in the dip, as he has length of apex within his surface lines, whether that apex reaches the surface or is found beneath the same, within the planes of his exterior boundary lines extending downward perpendicularly. This, in our opinion, is what section 2322 says in plain language.

Continuing further in the Amy & Silversmith case, we said: ''It seems that such grant by the statute to the miner, in view of the geological facts and history of veins, and particularly their almost universal tendency to depart from a perpendicular in their course downward, was deemed to secure to him a more satisfactory title than he would obtain if he were compelled to locate a parallelogram on the surface of the earth, as under the Spanish mining law, and take all and only that portion of the solid contents of the earth included in a parallelopipedon formed by dropping vertical planes downward on the line of each side of such parallelogram; and the intent of the

statutory grant of section 2322 is that the miner may follow his vein on the dip, but not on the strike, if it departs from the parallelopipedon indicated.   Therefore if the miner locates his claim regularly,—that is, as the statute contemplates that he will,—he has all that the statute intends to give him.   (See cases cited *supra.*)   If he 'will not or cannot make the explorations necessary to ascertain the true course of the vein, and draws his end lines ignorantly, he must bear the consequences' *(Iron Silver Min. Co. v. Elgin Mining & Smelting Co.,* 118 U. S. 207, 6 Sup. Ct. 1177); that is, he takes less of the apex and strike than he would obtain by a regular location, and consequently less of the dip."

We are still of opinion that the loss which a miner should suffer if he is obliged to make his location before he can trace the apex and strike of the vein for its whole distance, and thus makes his location irregularly, should be the loss of so much length of the vein on the strike as by his irregular location he has failed to obtain of length on the apex.   If this be the consequence which he is to suffer by reason of his irregular location, he loses simply that which he failed to locate, and he does not lose the vein of which he has located the apex. That he is to have the vein when he has the apex, we believe is the intent of the mining law.   (Rev. St. U. S. § 2322.)

We said further in the Amy & Silversmith case:   "But in order for the miner to make his location in exact conformity with the intent of the law, he must know, when he fixes his exterior boundaries, what the true strike of the vein is.   If he knows this, he will locate so that the strike shall pass through the middle of each end line, leaving 300 feet of surface on each side of the vein.   But the true strike is often ascertainable only after immense sums of money are expended in development.   He has 20 days, under our statute, to determine this important matter, which may take years to fully demonstrate.   If in this helpless condition the prospector commits an error of geological judgment, and upon such error he expends the toil of years, and that toil has wrought its reward, we are of opinion that the statute should be so construed as

will come the nearest to giving to him that whole section or block of the vein which we have above indicated that it is the intent that he shall have, as is consistent with the amount of apex which he has happened to secure by his surface lines, and their planes extended downwards."

We then proceeded to review the contentions of counsel in the case, and to discuss, as we understood them, the three leading cases in the United States supreme court, namely: *Mining Co.* v. *Tarbet* (the Flagstaff case) 98 U. S. 463; *Iron Silver Mining Co.* v. *Elgin Mining & Smelting Co.* (the Horseshoe case) 118 U. S. 196, 6 Sup. Ct. 1177; *Argentine Min. Co.*, v. *Terrible Min. Co.*, 122 U. S. 478, 7 Sup. Ct. 1356.

We then offered the following solution of the problem, and decided the case upon the principle, as found on page 575 of 9 Mont., as follows: "These three United States cases have compelled that court to endeavor to cast into the Procrustean bed of the statute individuals that strained the mold into which they were forced. But we believe that we may legitimately conclude from those cases that, in the facts now before us, the principle is that the north side line of the Amy terminates the strike of the vein, and that the dip must be controlled by the planes of the original end lines. The Amy people may follow their dip north of their north side line, but only as it lies between the planes of their end lines, as below considered. The object of parallelism in the end lines is that the locator may have his full section of the lode in its entire depth. But the determination of the strike of the Amy at a point on the side line deprives them of the dip northwest of that point, because the dip, in that portion, lies under the apex of the Non-Consolidated. The law intends that the plane of the end line shall operate as a boundary to the dip, and so operate at the point where the strike is ended. If the strike reached the original end line, as in a regular location, the bounding plane would there operate upon the dip. If the strike, by reason of its going out of a side line, falls short of reaching the original end line plane, that plane must take effect where the strike in fact ends; that is, at a point on the

side line (point *e*, Fig. 2), and, if it takes effect there, its parallelism must not be destroyed. We therefore have the bounding plane operating at the point where the apex leaves the north side line, and operating parallel to the east end line, and retaining its parallelism as originally marked on the ground. It is not a new line or plane, or one judicially constructed. It is determined by the location lines on the surface. There is never any readjustment according to subsequent developments. The parallelism of the end line planes is fixed by location, and never varies. The point of departure of the strike from the surface lines fixes the point where the end line plane is to perform its functions, whether that departure be at an end line, as contemplated by the statute, or whether accident has fixed it at a point on a side line. Complications are soluble upon this theory. The intent of the statute seems to be secured.''

As noted in the Amy & Silversmith case, the difficulties arise in applying the United States mining statutes to accidentally irregular locations; that is, locations where it is developed in time, and by explorations, that the apex and strike pass through the side lines, or a side line and an end line (as in the case at bar), or enter and pass out of the same side line. We essayed in that case a solution of this difficulty which could be applied to every irregularity, and which would secure absolute uniformity in all complications, and give to every mining location, as the statute intended and declared, the whole vein, in its whole depth, to the extent of the length of the apex which was located. We thought that we had accomplished that result. With due deference to those who have differed from us, we think so still.

The principle which we sought to maintain in the Amy & Silversmith case found its first approval in an appellate court in *Tyler Mining Co.* v. *Sweeney*, 4 C. C. A. 329, 54 Fed. 284. In that case the United States circuit court of appeals, Ninth circuit, discussed the extralateral rights of a location where the apex and strike passed through a side line and an end line. The situation differed from that of the Amy & Silversmith case, as in that case the apex and strike passed through both

side lines. But we understand that the circuit court of appeals approved the principle of our decision in the Amy & Silversmith case, for the opinion by Judge Hawley, a veteran lawyer and judge in the mining regions, says: "Here the location of the Tyler was properly made in the form of a parallelogram along the course of the lode or vein. The lode extends from the northwesterly end line for a distance of nearly 1,100 feet within the side lines of the surface location, and then so changes its course as to cross the southerly side line into the Last Chance location. The learned justice who wrote the opinion in the Horseshoe case (*Iron Silver Min. Co.* v. *Elgin Mining & Smelting Co.*, *supra*), when he said that the parallelism of the end lines 'is essential to the existence of any right in the locator or patentee to follow his vein outside of the vertical planes drawn through the side lines,' did not mean that it was essential to such right that the lode should extend in its length from one end line to the other of the location. If the lode in question, instead of extending into the Last Chance location, had abruptly broken off within the surface lines of the Tyler, near the point where in fact it crossed the line, there could certainly be no question as to the right of the Tyler to follow the lode or vein in its downward course for its entire depth outside of the vertical planes drawn through the side lines. The fact that it continued its course and crossed the side lines does not in any manner change this principle. In either case the locator is entitled to the same rights. In such cases the end lines are not necessarily those which are marked on the ground as such. An end line may be drawn at the point where the lode abruptly terminates within the surface lines, or at the point where the apex of the lode crosses the side line of the surface location. This, upon principle, justice, and authority, it seems to us, is the only reasonable construction that can be given to the statute. Whenever, and in whatever manner, this point has been presented by any similar facts, the rulings of the courts have been substantially in accordance with the views we have expressed. (*Golden Fleece G. & S. M. Co.* v. *Cable Consol. G. & S. M. Co.*, 12 Nev. 313; *Doe* v.

*Sanger*, 83 Cal. 203, 23 Pac. 365; *Kahn* v. *Mining Co.*, 2 Utah 174; *King* v. *Amy & Silversmith Con. Min. Co.*, 9 Mont. 543, 24 Pac. 200.) In the case last cited the lode crossed the surface lines without reaching either end line as marked on the surface, and the court held that, where a lode or vein crosses the side line of a location, the strike is terminated by the plane of such side line, and the right to follow the vein on its dip is determined by a vertical plane, parallel to the end lines, drawn downward, and which takes effect at a point where the apex intersects the side line. The court, in its opinion, after reviewing the Flagstaff case, 98 U. S. 463; the Argentine case, 122 U. S. 478, 7 Sup. Ct. 1356; and the Horseshoe case, 118 U. S. 196, 6 Sup. Ct. 1177,—and pointing out the differences existing between them and the Amy case, and stating the various contentions of counsel, said:    *    *    *"

The opinion of Judge Hawley then quotes the Amy & Silversmith case (9 Mont. and 24 Pac.) as to the principle therein announced. That case went back for trial, and appeared again in the circuit court of appeals as the *Last Chance Mining Co.* v. *Tyler Mining Co.* (April 9, 1894) 9 C. C. A. 613, 61 Fed. 557, and in the opinion the court adhered to the principle of the Amy & Silversmith case. In the meantime the Amy & Silversmith case had been reversed by the United States supreme court, March 5, 1894 (152 U. S. 222, 14 Sup. Ct. 510). But that decision is not mentioned in the Last Chance case (9 C. C. A. and 61 Fed.), and does not seem to have been considered by the circuit court of appeals. That court said : "The right of each party to follow the lode on its strike or true course lengthwise is terminated at the point where the lode crosses the side line of the Tyler and Last Chance locations; but each company would have the right to follow the lode, the top or apex of which is within its surface lines, on its dip, not upon its strike, upon a vertical plane drawn downward parallel to the end line, at the point where the strike of the lode ended; that is, at the point where the lode, in its lengthwise course, intersects the side lines of the claims. The Tyler would be entitled to all that portion of the lode that lies

westerly of such vertical line drawn downward, and the Last Chance would be entitled to all that portion of the lode easterly of said line."

As the United States Amy & Silversmith decision was not mentioned in 9 C. C. A. and 61 Fed., although preceding it in time, we may treat the United States decision as being subsequent. In that case, after stating the facts and the contentions, the United States supreme court said :    "Section 2322, cited above, declares that the locators of all mining locations shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their location; and also the exclusive right of possession and enjoyment of all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of said surface location. The surface side lines, extended downward vertically, therefore determine the extent of the claim, except when in its descent the vein passes outside of them, and the outside portions are to lie between vertical planes drawn downward through the end lines.    The difficulty in the present case arises from the course of the vein or lode upon which the Amy location was made. It is evident that what are called side lines of the location, as shown in the diagram, are not such in fact, but are end lines.    Side lines, properly drawn, would run on each side of the course of the vein or lode distant not more than three hundred feet from the middle of such vein.    In the Amy claim the lines marked as *side* lines cross the course of the strike of the vein, and do not run parallel with it.    They, therefore, constitute end lines.    It is true the lines are not drawn with the strict care and accuracy contemplated by the statute, and which could only have been done with more perfect knowledge of the true course or strike of the vein from further developments.    But, as was said in this court in *Iron Silver Mining Co.* v. *Elgin Mining & Smelting Co.*, 118 U. S. 196, 207, 6 Sup. Ct. 1177 :    'If the first locator will not

or cannot make the explorations necessary to ascertain the true course of the vein, and draws his end lines ignorantly, he must bear the consequences.' The court cannot become a locator for the mining claimant, and do for him what he alone should do for himself. The most that the court can do, where the lines are drawn inaccurately and irregularly, is to give to the miner such rights as his imperfect location warrants under the statute. It cannot relocate his claim, and make new side lines or end lines. Where it finds, as in this case, that what are called *side* lines are in fact *end* lines, the court, in determining his lateral rights, will treat such side lines as end lines and such end lines as side lines; but the court cannot make a new location for him, and thereby enlarge his rights. He must stand upon his own location, and can take only what it will give him under the law. Acting upon this principle, there is no lateral right to the holder of the Amy claim by which he can follow its vein into the Non-Consolidated claim. Mistakes in drawing the lines of a location can only be avoided, as said in the case cited, by postponing the marking of the boundaries until sufficient explorations are made to ascertain, as near as possible, the course and direction of the vein. * * * 'Even then,' the court added, 'with all the care possible, the end lines marked on the surface will often vary greatly from a right angle to the true course of the vein; but, whatever inconvenience or hardship may thus happen, it is better that the boundary planes should be definitely determined by the lines of the surface location than that they should be subjected to perpetual readjustment according to subterranean developments subsequently made by mine workers. Such readjustments at every discovery of a change in the course of the vein would create great uncertainty in titles to mining claims.' Applying this doctrine to the case before us, it follows that the vein in controversy, the apex of which was within the surface lines of the Amy claim, did not carry the owner's right beyond the vertical plane drawn down through the north side line of that claim. The Amy claim had no lateral right by virtue of the extension of the vein through what was called the north side

line of its claim, as that side line so called was, in fact, one of its end lines."

We understand that the United States supreme court not only reversed our judgment, but discarded as untenable the principle upon which we pronounced it. This decision was received with regret, not only by the bench and bar in the mining regions, but by both practical and scientific miners. The regret was greater in that the decision emanated from, as we said in the Amy & Silversmith case, " Mr. Justice Field, the judicial father of the mining law in the United States," a jurist who has illuminated this topic of the law by not only his profound learning, but by his practical experience in mining affairs.

As an indication of the reluctance with which courts inferior to the United States supreme court have accepted the reversal of the principle of the Amy & Silversmith case we notice the case of *Del Monte Mining & Milling Co.* v. *New York & L. C. Mining Co.* (Cir. Ct. D. Colo.; March 13, 1895) 66 Fed. 212.

In that case the court had before it the conditions of an apex and strike passing through an end line and side line. Judge Hallett, district judge, to whom courts and counsel in the mining regions are greatly indebted for his learning, which has been applied to this class of litigation, said :

" If the strike of the lode in the New York location kept its course from end to end of the location, the right to follow the lode outside the location would not be denied. As, however, it departs on its strike from the location on the east side, and not from the north end, it is said that the claim has no end lines, or, at all events, none that can be recognized as limiting the right to any part of the vein outside of the exterior lines of the claim. This is asserted as a proposition of law deducible from several decisions of the supreme court that the lines of a location crossed by the apex of a vein on its strike shall, as to such vein, be regarded as end lines, whatever their position may be; and, if this proposition be accepted, the south end line and east side line, intersected by the outcrop of this lode,

are not parallel to each other, as demanded by section 2320 of
the Revised Statutes.   This, however, has not been the inter-
pretation of law in the supreme court, or in any court, so far
as we are advised.   It is true that in the Flagstaff case, 98 U.
S. 463, and recently in the Amy & Silversmith case, 152 U.
St. 222, 14 Sup. Ct. 510, the supreme court declared that the
side lines of a location shall be end lines whenever the lode, on
its strike, crosses such lines; but these decisions do not affirm
that all lines of a location crossed by a lode on its strike shall
be end lines.   The most that can be deduced from them is that
opposite lines, parallel to each other, when crossed by the lode,
shall be end lines.   The case presented is not within the prin-
ciple of these decisions.   We have a lode extending on its
strike on the general course of the location, and within its side
lines a distance of 1,070 feet.   It is conceded that the south
end line of the location is well placed, and all parts of the lode
covered by the location are within the end lines as fixed by the
locator.   The difficulty arises from the circumstance that the
location extends in a northerly direction about 280 feet beyond
the point where the lode diverges from the side line.   No rea-
son is perceived for saying that this mistake in the length of
the location should defeat the right to follow the vein on its dip
outside the location.   It is said that we cannot make a new
end line at the point of divergence or elsewhere, because the
court cannot make a new location, or in any way change that
made by the parties.   (*Iron Silver Mining Co.* v. *Elgin Min-
ing & Smelting Co.*, 118 U. S. 196, 6 Sup. Ct. 1177.)   This,
however, is not necessary.   We can keep within the end lines
fixed by the locator in respect to any extralateral right that
may be recognized without drawing any line; and, if there be
magic in the word ' line,' it will be better not to use it.   In
this instance, as in most controversies between adjacent owners,
it is necessary to ascertain what part of the lode is within the
New York location, and this, according to the map, appears to
be 1,070 feet.   At all points on the dip of the lode into the
mountain westwardly we can ascertain the length of the lode
within the end lines by measuring the same distance from the

south end line produced. In this proceeding there is no departure from the end lines of the New York location as fixed by the relator, and there is no new line of location drawn for any purpose whatever. We keep entirely within the end line of the location as required by the statute, and the circumstance that we are somewhat short of the north end line does not in any way affect the principle to be followed in construing the statute. The same rule would be adopted if the lode were physically shorter than the location. Let it be assumed that upon a lode of the length of 1,000 feet (which is not an extraordinary occurrence) a location shall be made of the length of 1,500 feet, extending 250 feet in each direction beyond the ends of the lode. Would any one deny the right of the locator to follow the lode within his end lines, upon the ground that the lode did not come to either of such lines? I think not. The case is not different when the lode intersects one end line and not the other, but keeps within the location for a considerable distance. In that case, as in the accepted case of a lode traversing the location from end to end, the locator ought to be allowed to follow his lode into adjoining territory so far as he may within his end lines, and so far as he holds the outcrop in his location. Upon this construction of the statute respondent is entitled to so much of the lode upon its dip as lies between the south compromise line and the point of divergence of the apex of the vein from the New York location.''

It is also true that in Judge Hallett's case the facts differed from the Amy & Silversmith, in that the apex crossed a side line and an end line, instead of two side lines as in the Amy & Silversmith case. But Judge Hallett applied the principle of the Amy & Silversmith, and he so applied it after, as we understand, the United States supreme court had repudiated it.

One month after Judge Hallett's decision—that is, on April 15, 1895,—appeared the decision in the United States supreme court in *Last Chance Mining Co.* v. *Tyler Mining Co.*, the case which we have formerly encountered in 54 Fed., 4 C. C.

A., and 61 Fed., 9 C. C. A. · See 157 U. S. 683, 15 Sup. Ct.
733.   The case was decided in the United States supreme court
without it being necessary to treat the question of the apex
and strike passing through an end line and a side line.   But as
to this matter the court said :

   " Our conclusions in this respect obviate the necessity for
considering another very interesting and somewhat difficult
question presented by counsel.   It will be seen from the dia-
gram that according to the original location of the Tyler claim
the vein enters through an end, passes out through a side line,
while by the amended location it passes in and out through end
lines.   Of course, if the latter is a valid location, the owner
of the claim would unquestionably have the right to follow the
vein on its dip beyond the vertical plane of the side line.   But,
if it were not, and the original location was the only valid one,
has the owner the right to follow the vein outside any bound-
aries of the claim extended downward ?   It has been held by
this court in the cases heretofore cited that, where the course
of a vein is across instead of lengthwise of the location, the
side lines become the end lines, and the end the side lines; but
there has been no decision as to what extraterritorial rights ex-
ist if a vein enters at an end and pass out at a side line.   Is
that a case for which no provision has been made by statute ?
Are the parties left to the old rule of the common-law that the
owner of real estate owns all above and below the surface, and
no more ?   Or may the court rely upon some equitable doc-
trine, and give to the owner of the vein the right to pursue it
on its dip, in whatever direction that may go, within the limits
of some equitably created end lines ?   If the common law rule
as to real estate obtains in such a case, then, of course, on the
original location the owners of the Tyler claim would have no
right to follow the dip of their vein outside the vertical plane
of any of its boundary lines; and, even if the amended appli-
cation was perfectly valid, the question would arise whether
the rights acquired under it related back to the date of the
original location, or arose simply at the time of the amend-
ment, in which case there would be no doubt of the fact that

the owners of the Last Chance had by years a prior location. However, in the view we have taken of the other question, it is unnecessary to consider this.''

Mr. Justice Brewer wrote the opinion. There was no dissent. We assume that Mr. Justice Field concurred. The fact that the United States supreme court said in this case (with the justice concurring who wrote the Amy & Silversmith decision) that it had never given any decision as to what extraterritorial rights exist if a vein enters at an end line and passes out at a side line, we think is a sufficient warrant to us to reopen the discussion as to what principle of decision should apply in these irregular locations.

We can see but two solutions of the difficulty presented in this case: One is to say that when the apex and strike cross a located side line, such side line becomes an end line, in accordance with what we understand to be the decision in the Flagstaff case and in the Amy & Silversmith case in the United States supreme court. The other is to apply the Amy & Silversmith doctrine as announced in 9 Mont.

We will examine what seems to us to be the legitimate results of the first proposition. Turning again to the diagram, Fig. 1, the located east end line of the Niagara claim must still remain an end line. It was located as such, if that means anything; and the apex and strike pass through it, which fact, under any view, means everything. So this line is, and must remain, an end line. Then we have the south side line of the Niagara, also an end line, because the apex and strike pass through it. So we have two end lines not parallel to each other, but at an angle to each other not far from a right angle. But the end lines must be parallel. The result is that the Niagara cannot follow its dip at all. But the statute says it may follow the dip. These difficulties do not come to us at all as a surprise. We clearly foresaw them, and pointed them out in the Amy & Silversmith case, 9 Mont. 571, 24 Pac. 200. Thus we find that the Niagara claim, under these views, must be relegated to the common law. It owns downward inside of the perpendicular planes of its surface lines. But this result is not

the intent of the law.    (Rev. St. U. S.  § 2322.)    The intent
is that the locator shall have the right to the vein throughout
its entire depth if the apex lies within its surface lines, al-
though the vein, on its dip downward, departs from the per-
pendicular so as to extend outside of the side lines.    By call-
ing this side line an end line the whole intent of the statute is
destroyed, and we go back to the system of the Spanish law
(9 Mont. 567, 24 Pac. 200), which was deserted in the adop-
tion by congress of the American mining laws.

For example, again, in this case, reverse the the direction of
the dip, and assume that it goes north, then the Niagara people
would take all of the vein between the downward planes of the
end line and side line,—the lines E F and E H on the diagram.
They would get a fan-shaped section of the vein, rapidly in-
creasing in size with every foot downward.    That is to say,
such would be the result, unless we adhere to the common law
rule, and have no extralateral rights at all.    The plain fact is
that to call the side line an end line in this case leads us into
consequences that totally upset the .whole intent of the law.
We cannot subscribe to any such doctrine.    These contempla-
tions are not at all new to us.    We pointed out these difficul-
tions and absurdities in the Amy & Silversmith case, and we
then hoped that they would not again threaten the disturbance
of the rights intended to be given by the mining statutes.    We
feel now, as we did in the Amy & Silversmith case, that we are
not able to take the responsibility of any such destructive con-
struction.    And why, indeed, should a located side line be con-
verted into an end line by a court?    The locator never so in-
tended it.    He made the side line the long line, 1,500 feet in
length, intending it to be generally parallel to the vein.    The
law never intended that such a side line should be an end line.
If the side line is to become an end line and the end line a side
line, then the court working this readjustment of the lines
puts the side lines at a distance from the center of the lode
much greater than 300 feet.    What would be done with those
lines, and this extra surface taken in by them?    Shall they be
left so that they will include 1,000 or 1,500 feet in width when

the law intended the locator should have 600 feet only, or will these judicially created side lines be drawn in, and thereby new side lines made by the court? But ''the court cannot become a locator for a mining claimant.'' (Amy & Silversmith case, 152 U. S. 228, 14 Sup. Ct. 510.) The further we follow this doctrine into its details, the more untenable it appears. We shall abandon its pursuit, and leave its reconciliation to reason, law, and the intent of the statute, and practical application to others, who may be more skillful in making a reasonable construction.

As we leave this confusion, and turn to the other solution, —that of the Amy & Silversmith case in 9 Mont.,—difficulties disappear, and there is light upon the whole path. We can, then, do, as the United States supreme court said in its decision in the Amy & Silversmith case, on page 228, 152 U. S., and page 510, 14 Sup. Ct.: ''The most that the court can do, where the lines are drawn inaccurately and irregularly, is to give to the miner such rights as his imperfect location warrants, under the statute;'' that is to say, we can give to the miner, or rather the law, as we construe it, gives to the miner, as much length of strike, no matter how deep he goes upon the dip, as he has length of apex; and he loses in strike and dip only what he has failed to get in apex. That is what the district court, in this case, following the Amy & Silversmith case, 9 Mont. 543, 24 Pac. 200 accomplished. It gave to the Niagara the ore on the dip east of the point where the apex and strike crossed the south side line of the Niagara. This is what the circuit court of appeals did in *Tyler Mining Co.* v. *Sweeney,* 4 C. C. A. 329, 54 Fed. 284, and *Last Chance Min. Co.* v. *Tyler Min. Co.,* 9 C. C. A. 613, 61 Fed. 557. This is what the circuit court of the District of Colorado did in *Del Monte Min. Co.* v. *New York & L. C. Min. Co.,* 66 Fed. 212. This is what we understand the United States supreme court suggested in *Last Chance Min. Co.* v. *Tyler Min. Co.,* 157 U. S. 683, 15 Sup. Ct. 733, that it might do.

The language of Judge Hawley and Judge Hallett in those decisions is very apt when they suggest that, if the apex and

strike broke off abruptly at the side line, would any one contend that the dip could not be followed within the end lines? And why should it not also as well be followed if the strike, instead of physically ceasing to exist at all, simply ceased to further exist within the Niagara lines? We can think of no good reason which would allow the owner to follow the vein on the dip in the supposititious cases and deny him that right in the actual case. In the Amy & Silversmith case we spoke of the end line plane taking effect at the point where the strike in fact ended. By this use of the words ''end line'' perhaps we gave opportunity for the contention that we were moving an end line, and locating it in a place other than that fixed by the locator. We endeavored to make it clear that we were not moving an end line, but we were simply giving it effect at the only point where it could operate. But, as Judge Hallett says, if there is any ''magic'' in the word ''line,'' we will not use that word.

Perhaps we can more effectively describe the principle for which we contend as follows: Put one side of a square on the located east end line of the Niagara (line B D, Fig. 1), and let the other end of the square be long enough to reach the point where the strike and apex leave the Niagara ground (point A, diagram); then run this square up and down the east end line (line D B, diagram), and that line extended south, and run the square all over the perpendicular plane of this line; then the successive points which the long end of the square reaches will be the points beyond which, to the west, the Niagara people may not follow the vein on the dip, and beyond which, to the east, the Black Rock people may not come. Thus the Niagara is keeping upon the dip of the vein within its end lines, and it is not following the strike of the vein outside of any line. The principle might also be further illustrated by imagining a pair of draftsman's parallel rulers. One ruler is placed on the east end line of the Niagara (the line B D); its parallel is pushed out to the point where the apex crosses the side line (the point A), and set. The plane dropped perpendicularly from the westerly ruler would form

the boundary between the Niagara and the Black Rock on the dip of the vein.

Of course we understand the difference between the doctrine of the United States supreme court, which commences with the Flagstaff case, and received its last treatment in the Amy & Silversmith case, and our theory which we held in the Amy & Silversmith case. The supreme court doctrine seems to be that the side lines which are marked as such on the ground, namely, the 1,500 feet lines, as the side lines, and the 600 feet lines as the end lines, are not in fact the side lines and end lines; but what are the side lines and the end lines is to be determined by the subsequent demonstration of where the apex and strike cross the locator's lines; The trouble with the theory is that it leaves the determination of the boundaries to subsequent development, which may require years, and it calls that an end line which was never located as such, and it makes the side lines 600 feet long only, when the statute says they may be 1,500 feet, and makes the end lines 1,500 feet long when the statute says they shall not be over 600, and it gives a surface of more than 300 feet on each side of the center of the lode. We cannot be persuaded to think that this is the intent of the statute. As we noted in the Amy & Silversmith case, the difficulties of this construction did not fully appear in the Flagstaff and Argentine cases, where, as we understand, the strike and apex of the vein were practically at right angles to the length of the location. (9 Mont. 574, 24 Pac. 200.) But the theory meets great difficulty when applied to veins which have a general course lengthwise of the location, and which happen to slip out of the location by a side line before the end line is reached.

Again, we fully understand that the situation in the case at bar and the Tyler case and the Del Monte case differs slightly from that of the Amy & Silversmith case. In the Amy & Silversmith the vein passed through two side lines. In the case at bar and the other cases it passes through a side line and an end line. But we contend that the same reasoning applies to both situations; that is, that the miner shall have as much vein

in length on the strike, at all depths to which he may go on the
dip, as he has length of apex within his surface lines.    We
cannot too strongly emphasize our opinion, even at the expense
of tiresome reiteration, that this is the intent of section 2322,
Rev. St. U. S., and the true interpretation of the decisions
thereunder.    We believe that this doctrine should be applied
to both situations.    If the other doctrine is to be applied
to one situation, why not to both?    For it does not seem
to us consistent to say that the dip of the Amy & Silver-
smith must be cut off at their north side line, and that
the Niagara may go beyond their south side line, simply be-
cause the Niagara vein, on its eastward course on the strike,
goes out through an end line instead of a side line.    But when
we undertake to apply the United States Flagstaff and Amy &
Silversmith doctrine to the case at bar, we find that the Niag-
ara cannot follow its dip out of any of its lines, and it is cut
down to the common law rule of "*ad cœlum et ad orcum.*"

What we contend for is a uniform construction of the law;
a construction which will give the vein on the dip to every lo-
cator who has the apex in his location, and not give it to one
who has the apex, and withhold it from another who as fully
has the apex; that shall give it to the Amy & Silversmith and
the Niagara as well. Let us do this, and make estates in mines
uniform under the law.    This seems to us more reasonable
than to apply a construction which will give to one locator the
estate which the law contemplates and deny it to another.

The United States supreme court in *Last Chance Mining
Co.* v. *Tyler Mining Co.*, 157 U. S. 683, 15 Sup. Ct. 733,
observing the possibility or probability of being at some time
obliged to apply its Flagstaff and Amy & Silversmith rule to
the situation of a vein passing through a side line and an end
line, seemed to shrink from the consequences of the doctrine
(consequences which we pointed out in our opinion in the Amy
& Silversmith case, 9 Mont., at page 571, 24 Pac. 200), and
stated that they had never decided what extralateral rights
existed in such a situation. They also said :    "May the court
rely upon some equitable doctrine, and give to the owner of

the vein the right to pursue it on its dip, in whatever direction that may go, within the limits of some equitably created end lines ? '' We propose now just such an equitable doctrine, the same one that we proposed in the Amy & Silversmith case, and one wholly within the intent of section 2322, Rev. St. U. S.

We have hereinbefore, and especially in the Amy & Silversmith case, given the reasons for our belief that such a doctrine can, by a slight effort, be reconciled with the former decisions of the United States supreme court, and that, as Judge Hawley said in the Tyler case, 4 C. C. A. 329, 54 Fed. 292, '' this, upon principle, justice, and authority, it seems to us, is the only reasonable construction that can be given to the statute. '' We now feel at liberty to follow our convictions and our belief that our view of the law is correct, by reason of the indication given by the United States supreme court (157 U. S. 688, 15 Sup. Ct. 733) that they are willing to reconsider (or, as the court puts it, consider) this important principle in the construction of section 2322, Rev. St. U. S. We shall accordingly adhere to the principle of our Amy & Silversmith decision, and hold in this case that the judgment of the district court was within the law when it gave to the Niagara people the ore found on the dip of the Niagara vein south of their south side line, and east of the point where the apex and strike of the Niagara vein crossed the bounding side line between the Niagara and the Black Rock.

The appellants also rely upon some alleged errors in the instructions. It is contended by respondents that the errors in the instructions are not properly excepted to. Respondents cite cases from this court upon that subject. But we think the proper contention should have been as to whether the errors were specified on the motion for new trial. We are not satisfied that the specification was insufficient. We shall not, however, pass upon that question, as it has not been clearly or fully argued, and the question of practice is a delicate and troublesome one; but will proceed to an examination of the instructions. Our doing so cannot be a matter of complaint to

the respondents, for our examination of the instructions has satisfied us that there is no error therein. We will briefly review them.

Appellants complain that the court instructed the jury in reference to following a vein on its dip beneath the surface, but did not in this instruction inform the jury as to the matter of the parallel end lines. If the appellants mean that the court did not instruct as to the parallelism of the end lines as located, it is sufficient to reply that no contention was made upon this point. The parallelism of the located end lines is conceded, and the court, having adopted the Amy & Silversmith doctrine of this court, proceeded, of course, upon the theory that the original end lines continued to be the end lines.

The Black Rock people contended upon the trial that the "ore bodies" in question were upon a vein the apex of which was wholly within the Black Rock ground. This was called the "Stoner Vein." The apex of the Stoner vein, it appears, was on the Black Rock ground. One of the great contentions of fact in the case was that the Stoner vein, from its apex down to the ore bodies, was a continuous vein. Upon this contention, as noted in the statement of the case, the Black Rock failed. It seems to have been established by the decision that the Stoner vein was not continuous to the "ore bodies."

In instructing the jury upon this contention, the court gave them the following: "If you find from the evidence that what has been called in the evidence the 'Stoner Vein' is a separate and distinct vein from what is called the 'Niagara Vein,' and that the apex of said Stoner vein is inside the boundaries of the Black Rock claim, and also find that said Stoner vein connects with said Niagara vein at some point below the surface of the ground, and that such connection is made by following a continuous streak or body of quartz or ore, or by passing through vein matter as defined in these instructions, *or by following such material or indications as a practical miner would follow with the expectations of finding ore*, then, in such case, defendants are entitled to and are the owners of all quartz, ore, and mineral-bearing rock contained

in such vein below the said point of intersection, and plaintiff cannot recover therefor; it being conceded that the Black Rock lode vein owned by defendants is older and was located and patented prior to the time when the Niagara claim was located or patented."

This instruction, as we have just quoted it, was that submitted. The court, in giving it, struck out the portion which is in italics. Appellants complain of error in striking out that portion. We think in this the court was correct. The question was a geological one,—that is, whether the Stoner vein, in its downward course, connected with the Niagara,—and the court instructed how such connection would be made; that is, by following a continuous streak or body of quartz or ore, or by passing through vein matter, as defined in the instructions. This was a question of geology and of facts in nature. It would have left it to the jury entirely too indefinitely to have told them that they could find a continuous body of ore by following such indications as a practical miner would follow with the expectation of finding ore. We do not think that this is the method by which geological facts can be established. The application of such language as this which was stricken out of the instruction must not be confused with the use of similar language in reference to finding ore sufficient to support a location of a mine. When it is said that a location may be sustained by the discovery of mineral deposits of such value as to at least justify the exploration of the lode in the expectation of finding ore sufficiently valuable to work (*Shreve* v. *Copper Bell Min. Co.*, 11 Mont. 309, 28 Pac. 315, and cases therein reviewed), it is a very different question from telling a jury that the geological fact of the continuity of a vein to a certain point may be determined by what a practical miner might do in looking for some hoped-for continuity.

Objection is made to instruction No. 15, in that, as it is contended by counsel, the court assumed that the respondents had established a right to recover. But the court did not make this assumption. The instruction opens with the following language: "Plaintiffs having the burden of proof, they must

establish the material allegations of their complaint by a pre-
ponderance of evidence.''

Another instruction objected to by appellants is as follows:
''In estimating the value of the ore extracted from the Niagara
claim, you will take as a basis therefor the market value of
such ores on the dump of the claim, after deducting the cost of
mining and hoisting the same.''

The objection which appellant makes to this instruction, as
he states it in his brief, is that he was not a trespasser, and
was entitled to his actual expenses in extracting and treating
the ore, provided the expenses are reasonable, and as low as
the work could be done. He cites us to a number of cases in-
volving questions of accounting between cotenants when one
tenant has made necessary improvements on premises, or has
extracted ore therefrom.

We are of opinion that the instruction places the appellant
upon precisely the ground which he himself claims. The court
says that the basis of computation shall be the market value of
the ore on the dump after deducting the cost of mining and hoist-
ing the same. By the instruction the appellant is given credit
for the cost of mining and hoisting, just as he claims should
be. Furthermore, we think that the instruction, by its only
reasonable construction, gives the appellant the expense of
smelting and reducing the ore. The court says that the basis
shall be the market value of the ore on the dump. What is
market value? It is certainly that price for which the ore
could reasonably be sold on the market. That market value
would, in the mind of a buyer, be necessarily determined by
deducting the cost of reducing the ore; that is to say, if a pur-
chaser compute what he would give for the ore he would figure
the value of the same on the dump, and then he would deduct
from that value the cost of reducing the ore to bullion, and,
having deducted that cost, he would make a bid for the ore,
and this would constitute the market value. No one could
possibly contend that the market value of crude ore was the
value of fine silver in such ore. On the other hand, the market
value would be the value of fine silver, less the expense of

getting such silver out of the ore.   We are satisfied that the instruction was in fact precisely what the appellants claim it should be.

Appellants object to the refusal of the court to give the following instruction: ''The jury are instructed that if they believe from the evidence that the side lines of the Niagara location are practically perpendicular to the vein, then the side lines of said location become the end lines, and the plaintiffs cannot claim the dip beyond the side lines.'' But there was no evidence whatever in the case, and no contention, to support any such instruction.   The side lines of the Niagara not only are not practically perpendicular to the vein, but they are practically not far from parallel to the same.   There were no facts in the case to warrant the giving of such an instruction.

Appellants also urge error in the exclusion of certain testimony of a witness—William E. Hall—offered to be introduced.   Mr. Hall was a practical miner.   He testified as to what is known as the ''Rainbow Lode'' in the Butte district.   He said that it was his opinion that the vein on the Black Rock was a part of or an extension of the Rainbow lode.   He had examined the Black Rock mine.   He saw a fault in that mine.   Appellants then offered to prove by Mr. Hall that he had worked five claims on the Rainbow lode, and that the faults which he had found on the Black Rock are characteristic of the Rainbow vein.   The testimony was objected to, the respondents stating that, if the appellants intended to prove that this fault in the Black Rock extends to the Alice mine, with which mine Mr. Hall was familiar, they would not object.   Appellants stated that they did not intend to prove this.   The court sustained the objection, remarking, ''If it is for the purpose of attempting to show a condition of affairs here (that is, in the Black Rock) by comparison of what exists in the Alice, or in any other ground outside, unless it is shown that there is a continuity between the conditions which exist there and the conditions found in this ground,'' the evidence will not be admitted.   The objection was sustained.

We are of opinion that the learned judge of the district

court stated the reasons for excluding the testimony as completely as we could set them forth. The subject under consideration in Mr. Hall's testimony was a fault in the Black Rock vein. One certainly could not prove the existence of a fault in one vein by showing that there were other and disconnected faults in another vein, which the witness claimed was a continuity of the vein under consideration, without showing any continuity in the fault.

Again, appellants contend that the judgment should be reversed because the appellant's counsel were not present when the verdict was rendered, and thus had no opportunity to poll the jury. Appellants' counsel had made arrangements with the bailiff that when the jury agreed upon a verdict, he, the bailiff, should call counsel. This was a matter wholly out of the court, and had no place in the proceedings in the court. It appears that the jury came in at a time when all the counsel were absent. The bailiff omitted to send for appellants' counsel. The counsel made the bailiff his agent for this purpose, and, if such agent omitted to do that which he had agreed to do, we are not prepared to reverse this case for that reason. When it is the fact that the counsel had the privilege of being in the court, if he wished, when the verdict was received, and his accidental absence at that time was not owing to any order or any action of the court, or any conduct by the counsel or parties on the other side, we shall not reverse this judgment for any such reason.

Another ground set up for the granting of a new trial is the alleged misconduct by juror Hess. Hess makes an affidavit that he was ill, and that he agreed to the verdict in order to get discharged from service. But this juror never made any complaint to the court of his illness. When the jury came in and rendered its verdict, he said nothing to the court, and there was no intimation that he was ill, or needed any medical attendance. His alleged illness, and thereby his alleged coercion into the verdict, never appeared until after his discharge and his making an affidavit for the benefit of the appellants. The case was an equity one, the findings were advisory, and

the district court very properly disregarded this juror's affidavit given to impeach his own verdict. (*Gordon* v. *Trevarthan*, 13 Mont. 387, 34 Pac. 185.)

It is also attempted to be shown in juror Hess' affidavit that the bailiff in charge of the jury was guilty of misconduct. The story that juror Hess tells about the conduct of the bailiff bears upon its face all the appearances of absurdity. Perhaps the district court would have been perfectly justified in disbelieving Hess's statements in regard to the bailiff without any contradiction, but the affidavit was contradicted in many respects. The district court was perfectly justified in paying no attention to the showing attempted to be made by the Hess affidavit.

Having reviewed all the questions raised in this case, it is ordered that the judgment, and the order denying a new trial, be affirmed.

*Affirmed.*

PEMBERTON, C. J., and HUNT, J., concur.

